## PEOPLE v. BOWERS.*

### No. 20,345; June 14, 1888.

18 Pac. 660.

**Courts—Appellate Jurisdiction of Supreme Court in Criminal Cases.**—The supreme court, under the constitution of California, article 6, section 4, has appellate jurisdiction, in criminal cases prosecuted by indictment in a court of record, in questions of law only, and cannot set a verdict aside where the evidence is conflicting.

---

*For subsequent opinion in bank, see 74 Cal. 415, 24 Pac. 752.

Homicide—Evidence.—Where a Druggist Testifies That He had Sold Defendant, a Physician, who is on trial for murdering his wife by poisoning with phosphorus, medicine during the illness of his wife, and says he would not put up phosphorus in overdoses for anyone but a physician, and is asked if he would then, and answers, not until he had spoken to the physician, the answer cannot prejudice defendant, as it is not proof of a general custom, nor is it claimed that he had sold phosphorus to defendant.

Homicide—Order of Testimony.—It is not Error to allow a witness for the prosecution to testify after defendant has opened his case, when the reasons given by the court for so doing show there has been no abuse of the discretion given by Penal Code, section 1094.

Homicide—Examination of Experts.—In a Trial for Murder, Where the State claims the death was caused by poisoning, it is admissible to ask expert witnesses the cause of the death, when there is some evidence to support the facts hypothetically stated in the questions.[1]

Homicide.—It is Proper to Propound a Hypothetical Question to an Expert, based on any facts of which there is evidence, though the weight of evidence may be strongly against the truth of the facts assumed, and it is for the jury to disregard the opinion if the evidence fails to establish the facts thus assumed.

Witness—Questions by the Court.—It being in the discretion of the court to permit leading questions, it may, of its own motion, ask questions of witnesses in that form.

Homicide—Objection to Evidence.—Where the Stomach and Intestines of Deceased are set aside for analysis, but not sealed, and the physician who had them in charge is certain they have not been tampered with, it is for the jury to decide whether there is a doubt as to that fact; and an objection to the sufficiency of the identification, not made until after the testimony for the people is all in, comes too late.

Criminal Trial—Examination of Defendant.—To ask defendant, on cross-examination, the name of his father and mother, cannot prejudice him.

Criminal Trial—Conduct of Prosecuting Attorney.—Where the prosecuting attorney proposed to read to the jury in his argument a paper not in evidence, and stated that it purported to be the record of defendant as furnished by a chief of police, while his course is reprehensible, it does not prejudice defendant when it is promptly

---

[1] Cited in People v. Sampo, 17 Cal. App. 150, 118 Pac. 963, where the court say that a physician might testify that "the wound could have been inflicted by means of said rock," the witness not being asked to testify as to who inflicted the wound nor whether it was caused by the rock exhibited to the jury.

rebuked by the court, who charges the jury that statements of counsel not in proof are not evidence, and to be disregarded.

**Criminal Trial.**—Where the Court, After Charging in Strong Language as to the Presumptions surrounding defendant, and the certainty of proof required, calls the jury's attention to the fact that the law should be fearlessly administered, and that, if they were satisfied beyond a reasonable doubt of defendant's guilt, they should be derelict in duty if they failed to find so, it is not prejudicial, though not in good taste.

**Homicide.**—Where, After Defendant Appeals from a Conviction for Murder, a third person confesses that he committed the crime, and that defendant is innocent, these matters not being in the record, and there being no law by which they can be for the first time presented to the supreme court, cannot be considered by it.

**Witness—Credibility.**—A Witness cannot be Asked, on Cross-examination, whether she is not in the habit of playing cards for money, and asking for money from her daughter for that purpose, under Code of Civil Procedure, section 2051, providing that evidence of a particular wrongful act is not admissible to impeach a witness.

APPEAL from Superior Court, City and County of San Francisco; D. J. Murphy, Judge.

J. Milton Bowers was indicted for the murder of his wife. The court, after the case for the prosecution had closed, and the defendant's case had begun, permitted a witness for the prosecution to be called under Penal Code of California, section 1094, which provides that, for good reason, the court, in its discretion, may change the order of trial as provided by the statute. Defendant was convicted, and sentenced to be hanged, and appeals.

Charles N. Fox and Colin Campbell for appellant; George A. Johnson, attorney general, for the state.

PATERSON, J.—On August 24, 1885, Mrs. Cecelia Bowers, wife of defendant, Dr. Bowers, became very ill with what appeared to be a bilious colic. On the following day, and later, physicians were called in, and, after making a diagnosis of the case, all pronounced it to be "abscess of the liver." She was treated accordingly by the attendant physicians, but continued to suffer great pain in the right side, and to vomit and discharge large quantities of pus and bile until her death,

which occurred November 1st following. On November 3d the coroner of the city and county of San Francisco received an anonymous communication which stated that there was reason to believe there had been foul play in the treatment of Mrs. Bowers during her last illness, and requesting an official investigation. The coroner proceeded to the house of defendant, where preparations were being made for the funeral, summoned a jury, and held an inquest. He then postponed the investigation until after the funeral, upon a promise made by those in charge of the funeral that the remains would not be interred, but would be placed in a vault, and returned to the morgue for the autopsy. Owing to a misunderstanding, the remains were interred at the conclusion of the funeral services on that day, November 3d. On the morning of November 5th the coroner discovered the mistake which had been made, disinterred the remains, and held the autopsy. On December 30, 1885, an information was filed, charging the defendant with having willfully, unlawfully, and of his malice aforethought killed said Cecelia Bowers; and on April 23, 1886, he was convicted of murder in the first degree, and thereafter, June 2, 1886, his motion for a new trial having been denied, he was sentenced to be hanged. The case is made remarkable, in one respect, by recently discovered evidence which . purports to be the written confession of one Henry Benhayon, brother of the deceased, in which he declares that he poisoned his sister, and that Dr. Bowers is innocent. If the events occurred as stated in the brief of appellant's counsel—and they are matters of notoriety—the facts would entitle the defendant to a new trial on the ground of newly discovered evidence, if presented in time to the court below; but they were not presented to the court below, and unfortunately could not be presented, because they occurred pending appeal. The appeal herein was taken on June 2, 1886. On October 23, 1887, the coroner received through the mail a letter which had been deposited in a postal box late the night before, which reads as follows:

"City, October 22, 1887.

"Dr. J. I. Stanton, Coroner.

"Sir: That I may not change my resolution, I send you this in advance. I am the cause of my sister's (Cecelia Bowers') death on November 1, 1885. I could not keep the horrible

56

secret any longer; I had to write it in a memorandum book, and I lost it. This is one of my reasons for making my exit from the world's stage. Dr. Bowers knew nothing of my ———, and had no hand in her death. No one is to blame but myself, and I take this step to relieve myself from further misery, and all concerned. I do not wish to see my mother.

"H. BENHAYON."

On receipt of this letter a search was made for the author thereof, and his body was found on the floor in the room of a lodging-house, with a bottle nearly empty, but containing poison, lying beside it. The written confession and letters which were found on a table in the room stated, in substance, that Dr. Bowers and his wife had always quarreled; that Mrs. Bowers said she would poison the doctor before he should leave her; that he (Benhayon) secured the poison with which to kill the doctor, but his sister would not listen to the proposition, and threatened to expose him; that, after his sister became sick, he felt an irresistible impulse to "use the stuff on her, and finish Bowers later"; that he took a pill and capsule out of her box, and filled the capsule with two kinds of poison, put it back, and took others, until four capsules had been poisoned and exchanged; that he did not think Bowers could get in any trouble, for the person who furnished him with the poisons said a chemist told him no doctor could find it in the stomach, for it was blood-poisoning; that he forced his sister to give him an order for her insurance policy in the F. of P., but he dare not present it. In the letter to Dr. Bowers he stated to him that Mrs. Bowers had been unfaithful, and cautioned him against certain friends, whom he charged with criminal intimacy with her. While it is admitted by counsel for appellant that ordinarily no argument could be made here upon facts occurring after appeal taken, it is urged that the evidence which has been discovered in this case "is of so grave a character, and points so strongly to the innocence of this defendant, that, however informally it may have come to the attention of the court, this or any other court of competent jurisdiction should say that he shall not be executed until it shall have been submitted, in common with other evidence in the case, to a jury of his country." But, manifestly, the court has no authority to consider these matters as thus

presented. They are no part of the record sent to us from the court below, and there is no provision of law by which newly discovered evidence may be presented to this court in the first instance. The remedy in such cases rests with the executive. He alone can afford relief.

It is claimed by counsel for appellant—and this is their leading contention—that the evidence is insufficient to justify the verdict of the jury. A determination of this question has imposed upon us an examination of all the evidence offered, the statement of which covers about twelve hundred pages of the record. It would be impractical to discuss within the limits of a judicial opinion the character, bearing, and weight of all the testimony offered by the respective parties in this case. It might be sufficient to say that the evidence is conflicting, and that it would be an invasion of the province of the jury to go into an examination of the. weight of the evidence. It is claimed, however, that inasmuch as the evidence of death by poisoning is all circumstantial, and especially as it is all expert opinion testimony, the ordinary rule should be relaxed, because the untrained mind of the jury cannot be expected to comprehend or appreciate the full effect of such evidence. But this might be said in every case where the verdict is based upon expert testimony, and the judgment of this court as to the facts be substituted for that of the jury. Whatever may be the right or duty of this court to interfere with the verdict of a jury in civil cases when it deems it to be against the evidence, the constitution provides that it "shall have appellate jurisdiction, . . . . in all criminal cases prosecuted by an indictment or an information in a court of record on questions of law alone" (article 6, section 4) ; and in cases of this kind, where it appears that there is a conflict in the evidence, we are not justified in setting aside the verdict. The question is not whether the witnesses for the prosecution are less intelligent and more prejudiced than those of the defense; not whether what they said was true or false. Those are matters for the jury. The credibility of the witness and the weight of his testimony is always for the jury. Counsel for the defendant do not claim that there were no expert witnesses whose testimony was deserving of respect and weight, but it is claimed that all the expert testimony given in this case which is entitled to consideration

came from witnesses for the defendant. Their position is clearly set forth in the following frank statement by one of the defendant's attorneys: "If it shall be said that these strictures upon expert medical testimony apply to the testimony of the experts who testified in behalf of defendant as well as to that of those on behalf of the prosecution, I answer that the value of the opinion of a medical expert depends upon his intelligence, his knowledge of the subject upon which he gives his testimony, and his honesty and impartiality; and I ask the court to carefully examine the testimony of the expert witnesses for both the prosecution and defense, and determine whether these desiderata—some or all of them—are not generally absent in the testimony of the expert witnesses for the prosecution, and present, in an unusual degree, in the testimony of defendant's experts. There are expert witnesses—the exceptions, it is true—whose testimony the courts receive with favor and respect, and to whose opinion they accord the utmost deference; and some such witnesses, at least, the defendant has, I think, been fortunate in securing." The theory of the prosecution is that defendant caused the death of his wife by administering to her toxic doses of free phosphorus. This theory stands or falls upon the evidence offered as to—First, the clinical symptoms; second, the pathological conditions disclosed by the autopsy; and third, the presence of free phosphorus in the organs of the deceased, as revealed by chemical analysis.

1. The Clinical Symptoms. The clinical symptoms in phosphorus poisoning are violent cramps in the stomach, vomiting of dark green matter, a burning sensation in the stomach, and silvery white condition of the tongue and mouth, rawness of the throat, disagreeable taste in the mouth, purging, convulsions, collapse, and coma preceding death. Counsel for appellant has greatly aided us in our examination of the testimony by a synopsis thereof, in which the substance of the evidence is very fairly stated, and there is some evidence as to every clinical symptom mentioned. It is claimed, however, that the testimony of the principal witnesses for the people, as to these symptoms, is conflicting, and that the testimony of one witness nullifies that of another; but, as before stated, it is for the jury to determine from all the evidence which witness is to be accredited.

2. Pathological Conditions. There were present at the autopsy eleven physicians, all of whom testified at the trial. The pathological conditions are stated in the official report of Dr. Blach, the city physician of the city and county of San Francisco, who superintended the autopsy on the body of the deceased in pursuance of an official investigation as to the cause of her death. The report of the autopsy is as follows: "External inspection: Body of a well-nourished woman four feet eight inches in height, about one hundred and twenty-five pounds weight; rigor mortis absent; no external marks of violence. The mouth: The mucous membrane of the mouth very white and thickened. The esophagus: The mucous membrane presents a similar appearance to that of the mouth, but not so general. Body emits no odor of decomposition. The thoracic cavity: The lungs apparently normal; pericardial fluid about half an ounce, and somewhat reddened; heart weighs seven ounces, valves healthy, but walls thin; atheromatous patches on the aorta; clot of blood in the heart. Abdominal cavity: Liver weighs one pound and twelve ounces, not adherent to walls of the abdomen; capsules slightly adherent to the convex surface; the consistency of the liver soft; the stomach nearly empty; ulcer one and one-half inches from the cardiac orifice, near the greater curvature, about the size of a quarter of a dollar; the edges of the ulcer raised; the tissues of the mucous membrane of the stomach about the ulcer infiltrated with pus; extravasations of blood in the neighborhood of the ulcer; capillary hemorrhages in the fundus; pyloric extremity highly congested; mucous membrane of the stomach thickened, and of an opaque, yellowish color; intestines slightly congested. Kidneys: The right one normal; small extravasation of blood in the center of the kidney; left kidney apparently normal. Pelvic cavity: Contains three quarts of blood, partially organized; also extensive extravasation of blood in the pelvic cellular tissue; the left ovary contains a large mass of blood; the right ovary normal; left fallopian tube dilated, and contains remains of fluid exudations; right fallopian tube dilated, and filled with blood; the uterus healthy in every respect. Cranial cavity: Slight aedemia on surface of brain; brain otherwise healthy." Dr. Blach testified that he was satisfied at the autopsy there was fatty degeneration of the kidney, but did not care to say so

in his report, because it was a matter that could not be determined with certainty without a microscopic examination. Dr. Abrams, who made the examination with the microscope, testified that he found the liver in a high state of fatty degeneration. Dr. Stallard corroborates the statement. It was shown that the liver was greatly atrophied, and bore no evidence of ulceration or abscess. When the stomach was opened, some of the physicians present noticed a strong garlicky odor, which is one of the evidences of phosphorus poisoning. There was evidence showing that the ulcer in the stomach was undergoing a healing process; that the blood clots were harmless, because encysted by nature, and that these reparative processes had gone on to such an extent that the continued nausea and vomiting, which increased as the patient grew worse, could not be attributed to either the ulcer or haematocles. The physicians having found no cause of death, the stomach was removed, and given to Dr. Johnson for chemical analysis; and the heart and liver were given to Dr. Abrams for microscopic examination. Dr. Johnson testified, in substance, that he first tested the contents of the stomach for arsenic, and then for mercury, and finding no trace of either of these poisons, but having detected an alliaceous odor in the nature of garlic, he made a test for phosphorus by the Mitscherlich apparatus and process; that by this test he obtained luminosities, which were proof positive of the presence of unoxidized phosphorus; that sulphur has the property of condensing upon its surface free phosphorus; that he took the distillate (from the contents of the stomach and the intestines) in the flask, placed it in a small piece of sulphur, and then sealed it; that after heating it, the sulphur was removed, dried, and placed in the palm of his hand, and the result was a light luminosity or phosphorescence; that there was a strong alliaceous or garlicky odor from the distillate. He testified that free phosphorus is an irritant poison, and in its free form, as he found it, produces vomiting, pain in the stomach, convulsions, coma, and death; fatty degeneration of the liver being one of its accompaniments. He expressed himself as perfectly satisfied, after finding free phosphorus in the stomach, that death was caused by free phosphorus. Dr. Abrams testified that from what he observed at the autopsy, from the examination he made with the microscope, and what he saw

in assisting Dr. Johnson in his chemical analysis, that ''the introduction of phosphorus or caustic poison was the cause of the death of Mrs. Bowers.'' Many of the expert witnesses testified that they knew of no disease that could produce all the pathological conditions described; that, while each and every one of the conditions might be the result of some natural disease, when taken separately, they could not, taken all together, be the combined results of any disease. Dr. Johnson and Professor Price both experimented with and made tests of ''Fellows' Sirup of Hypophosphites,'' which had been given to Mrs. Bowers by her physicians, and which the defense claimed might account for the luminosity and garlicky odor, and both testified that no traces of luminosity or garlicky odor could be discovered. In short, the testimony introduced by the prosecution tended to show that it was a case of slow poisoning by the administration of free phosphorus, which produced the ulcer of the stomach by its irritant action, affected the whole mucous membrane from the mouth to the stomach, causing excessive vomiting, and fatty degeneration of the liver. The most that can be said against the verdict, so far as the evidence goes, is that it depends entirely upon circumstantial evidence, and that the evidence as to the circumstances is conflicting. But the experts were shown to be competent to speak. The jury heard their evidence, passed upon their credibility, and are the sole judges of the weight to be given to the testimony of each witness. In all cases of poisoning, except where there are eye-witnesses, the evidence is necessarily expert opinion in character; and, if the rules which are here urged were to be applied, it would be impossible to secure a conviction in any such case.

Conceding that the deceased was poisoned, as claimed by the prosecution, it is still contended that the evidence is insufficient to show that the defendant administered the poison to her; and that, if she was killed with phosphorus, there is stronger evidence to prove that some person other than defendant administered it to her than there is to prove that the defendant administered it. But here, again, follows an argument by counsel for the appellant, which is robbed of its force by the fact that there is evidence, although conflicting, as to the defendant's treatment of his wife during her lifetime, and by the fact that he expected to receive a large sum of

money upon her death. That he treated her cruelly there is
abundant evidence, and as to means and opportunity to com-
mit the crime, there is no question. So far as the intent and
motive are necessary in making out the offense charged, it is
sufficient to say that, in addition to evidence of cruel treat-
ment, and declarations indicating regret on the part of the
defendant that his wife was not killed in an accident which
occurred while driving, and a wish that she might die, there
is evidence that he secured insurance upon her life, in vari-
ous societies, to the amount of seventeen thousand dollars.
The fact that he had his own life insured in her favor for a
like amount is a circumstance which naturally weakens the
force of the argument made by the prosecution so far as the
insurance upon her life bears upon the question of motive,
but it was for the jury to say, from all the circumstances of
the case, after they became satisfied that the deceased was
killed by phosphorus, who administered it, and for what pur-
pose. Our attention is directed to the authorities, which say
that in cases of this kind the proof ought to be not only con-
sistent with the prisoner's guilt, but inconsistent with every
other rational conclusion. This is, of course, true; and the
jury were told repeatedly that the circumstances proved must
exclude to a moral certainty every other hypothesis except the
single one of guilt. But it does not follow that, because there
is evidence tending to show that defendant did not commit the
crime, the proof is consistent with the prisoner's innocence.
Evidence is simply the means of proving a fact; that which
tends to establish a fact. Proof is the establishment of a
fact by evidence; and it is only upon the theory that the wit-
nesses whose evidence was favorable to the defendant, and no
others, are to be accredited in their opinions, that it can be
said, as matter of law, the proof is consistent with innocence.
The jury may not have believed any one of the witnesses for
the defense in anything he said, and were not bound to say
there was a reasonable doubt because the witnesses of the
prosecution did not agree as to the cause of the conditions
found, or the cause of the death of deceased.

At the trial a motion was made to strike out the testimony
of Dr. Johnson bearing upon the chemical analysis, on the
ground that there was not sufficient proof of identity of the
material submitted to the witness for analysis, and upon the

further ground that proper precautions had not been taken to prevent said material from being tampered with. It appeared that the anatomical jars which held the stomach and contents, and the contents of the intestines, were covered like preserve jars, and wrapped in paper, but were not sealed at any time; were exposed during the autopsy; and were afterward locked in a case for two days in the laboratory of Cooper Medical College, to which Dr. Johnson and the janitor (who died prior to the trial) had access. Dr. Johnson was quite certain that the jars had not been touched from the time he placed them in the laboratory until he took them out again. No objection was made to the sufficiency of the evidence to identify the material at the time the doctor was examined as a witness, nor until the evidence for the prosecution in chief was all in, when the motion to strike out was made. The evidence being relevant and material, the objection came too late. But, in any event, it was for the jury to say whether it had been tampered with, or whether there was a doubt as to that fact. There were no suspicious circumstances tending to show that the jars had been tampered with; and, while those in charge did not employ the safeguards which might reasonably be expected from men who knew that the materials in their possession were to be used as evidence against a person suspected of murder by poison, yet, in the absence of some evidence tending to show that the jars were tampered with, we cannot presume that anything was added to their contents.

During the progress of the trial the court propounded to some of the expert witnesses several questions which counsel for appellant claimed were improper. We see no valid objection to the questions thus asked, except that in form they are leading and suggestive. If they assumed facts not proved, the attention of the court ought to have been directed to this objection. While it was probably not the duty of the defendant to urge his objections to questions asked by the court with the formality and persistence required when counsel for the prosecution were examining the witness, yet the attention of the court ought to have been called in some manner to the objectionable matters. It is in the discretion of the court to allow counsel to ask leading questions, and there is no reason why the court may not, of its own motion, ask questions in that form.

The conduct of the assistant district attorney in proposing to read to the jury, during his argument, a paper which had not been introduced in evidence, and in asserting that it contained the record of defendant from the chief of police of Chicago, was inexcusable and reprehensible. We think, however, that, so far as the defendant's interests were concerned, no prejudice resulted from this violation of professional duty, for it was promptly rebuked by the court at the time, and the following instruction was thereafter given: "In weighing the evidence in this case, it is important that you should bear constantly in mind that statements of fact made by counsel, whether in examination of witnesses or in argument of the facts so stated, are not in proof, are not in evidence, and are to be discarded from your consideration."

The court did not err in overruling objections to questions put to Drs. Johnson, Lane and others, calling for their opinions as to the cause of death. It is sufficient if there be some evidence in the case to support the facts stated in the hypothetical question: Regina v. Frances, 4 Cox C. C. 57; Hurst v. Railroad Co., 49 Iowa, 76; Filer v. Railroad Co., 49 N. Y. 42; Webb v. State, 9 Tex. App. 490. Some of the questions called for an opinion as to the cause of death. In cases of this kind this is permissible when the facts are stated to or by the witness. By answering this question the witness does not assume the province of the jury, and determine the precise question they are to pass upon. The question was, What caused the death? not, Who caused the death? Conner v. Stanley, 67 Cal. 316, 7 Pac. 723, cited by appellant, is clearly not in point: State v. Smith, 32 Me. 370, 54 Am. Dec. 578; Shelton v. State, 34 Tex. 664; Ebos v. State, 34 Ark. 520; Lawson, Exp. Ev., 221.

Mrs. Benhayon, a witness for the prosecution, was asked, on cross-examination, whether she was not in the habit of playing cards for money, and demanding money from her daughter for that purpose. "Evidence of particular wrongful acts is not admissible to impeach a witness" (section 2051, Code of Civil Procedure) ; and we cannot see the pertinency of the evidence if offered for any other purpose.

In one of the hypothetical questions asked by him, counsel for the people used the word "luminosity." The question was objected to on the ground that this word introduced a con-

clusion of fact drawn from actual facts found during the chemical analysis. The witness, Dr. Dennis, seems to have understood the meaning of the word, and no attempt was made, on cross-examination, to show that he meant any other kind of luminosity than that described by Dr. Johnson. It is a word which evidently has a definite meaning, and is well understood by medical experts when used in explaining the result of a chemical analysis.

The court did not err in allowing Dr. Lane to testify on behalf of the prosecution after the defendant had opened his case. The reasons given by the court show that there was no abuse of discretion. The same may be said of the ruling of the court in allowing the witness Price and others to testify in rebuttal: Pen. Code, sec. 1094; People v. Strong, 46 Cal. 302.

There was some evidence tending to show the existence of every fact stated by counsel for the people in the hypothetical questions propounded to Dr. Lane. It may be apparent, as claimed by counsel for defendant, that some of these facts were not proved, the weight of the evidence being strongly against them; but this does not determine whether the proper foundation has been laid for the question. It is proper to assume, within the limits of the evidence, any state of facts which the evidence justifies, and obtain the opinion of the expert. The facts are assumed for the purpose of the question only, and, of course, if the evidence fails to establish the material facts thus assumed, the jury must disregard the opinion: Regina v. Frances, supra; Lawson, Exp. Ev., 153.

The testimony of Brooks and Hogan was properly admitted. The defendant's declarations as to the conduct of his wife were evidently made to show that her death was caused by her own acts. This is clearly shown by his declaration made to the witness Hogan in the city prison. But, without a declaration by the defendant that such was his purpose, the jury might readily believe from the statement itself that it was made for the purpose of explaining the cause of her death.

A. Hogg was called as a witness, and having testified that he was a druggist, and had sold Dr. Bowers medicine several times during the last illness of Mrs. Bowers, without prescriptions therefor, said that he would not put up phosphorus in overdoses for anyone not a physician. He was asked this ques-

tion: "But if a physician called upon you for it in that way, you would put it up, wouldn't you?" Counsel for the defendant objected to the question on the ground that it was incompetent. The objection was overruled, and an exception reserved. The witness answered: "I would make some remark to the physician first, if it were an overdose, because otherwise I would be liable to get into trouble." We cannot perceive how this answer could have prejudiced the defendant's case. It was not an attempt to prove a general custom, and what Mr. Hogg would do was entirely immaterial. It was not claimed that he had sold phosphorus to Dr. Bowers.

On cross-examination the defendant was asked to name his parents. Objection was made that it was not cross-examination. The objection was overruled, and an exception taken. The defendant answered that his father's name was Matthew Minslow Bowers, and his mother's maiden name was Stump. This answer certainly did not prejudice the defendant. The same may be said of the answers given to other questions put to defendant and those asked in the cross-examination of Jenkins.

Several exceptions were taken by counsel for defendant to the rulings of the court in excluding and admitting evidence which we do not deem of sufficient importance to review in detail. It is sufficient to say that we have carefully examined them all, and found no prejudicial error in any of them.

The charge of the court as to the credibility of defendant and the weight of his testimony has been approved here several times: People v. O'Neal, 67 Cal. 378, 7 Pac. 790. That portion of the charge which counsel referred to as "an elaborate speech to the jury" might have been omitted without injury to the rights of either the prosecution or the defense, but we cannot see any prejudicial error in it. The court had given many instructions couched in very strong language, cautioning the jury against forgetting the presumptions with which the law clothed the defendant, and the certainty of proof of every element which the law required before conviction; and, in closing the charge, called the attention of the jury to the fact that the law should be fearlessly and impartially administered; that verdicts should not be dictated by any other considerations than the law and the evidence; and that, if they were satisfied beyond a reasonable doubt and to

o

a moral certainty of the guilt of the defendant, they would be derelict in their duty to the people of the state if they failed to say so. It would be better taste and more dignified judicial style to give the law to the jury in its simplest forms, applying such principles thereof as are applicable to the facts of the case, without lecturing the jury upon the consequences of a failure to obey the mandates of their oaths. Anything else is liable to lead the court into error, cause suspicion of prejudice against one side or the other, and give this court unnecessary labor and annoyance.

We have carefully examined the record upon every question presented by the defendant's counsel on this appeal, and we see nothing in the record which would warrant us in reversing the judgment. The judgment and order denying a. new trial are affirmed.

We concur: Searls, C. J.; McFarland, J.; Sharpstein, J.; McKinstry, J.; Thornton, J.