[Civ. No. 5980. Third Appellate District.—December 31, 1938.]

VICTOR EDWARD SMITH, Respondent, v. THOMAS SCHUMACKER et al., Appellants.

C. W. Dooling and Edwin V. McKenzie for Appellants.

Sheridan Downey, Clifton Hildebrand and J. R. King, Jr., for Respondent.

PULLEN, P. J.—This is an action by plaintiff under the Federal Employers' Liability Act against the Western Pacific Railroad Company, a California corporation, and its trustees in reorganization, for damages for personal injuries alleged to have been sustained by the negligent acts of the employer.

It is admitted that this action is properly maintained under the terms of the act for the reason that both appellants and respondent were engaged in interstate commerce and transportation at the time the accident is claimed to have occurred, and it was as a result thereof, that both respondent's legs were amputated at a point between the knee and the hip. No question is raised as to the amount of the verdict, to wit: $25,000, but appellants rest this appeal upon the issue of liability and the lack of substantial evidence to support the verdict.

This is the second trial of the action. In the first trial, on motion of defendants, the court granted a directed verdict on the causes of action set forth in the first, second and third counts in the complaint and denied a similar motion on the fourth count. Upon this count the jury found for the plaintiff, and allowed him the sum of $20,000. The trial court then granted a motion for a new trial upon the ground that the evidence was insufficient to sustain the judgment.

In the second trial, confined to the issues raised by the fourth count, a verdict in favor of plaintiff was again returned. Defendants' motions for a directed verdict and for a new trial were denied and judgment was entered on the verdict. This appeal is from that judgment. The fourth count of the amended complaint charges, first, specific negligence, and secondly, aggravation of an existing disease resulting in amputation of the left leg. Later a supplemental

cause of action was set up alleging the amputation of the right leg.

This fourth count of the amended complaint in substance sets forth that at Cresta, on the Western Pacific, while in the course of his duties, plaintiff was running to catch a caboose in the early morning of October 5, 1934, when he stumbled and fell over a discarded angle bar, negligently and carelessly placed, imbedded in the dirt between the passing track and the main line, and allowed to remain upon the right of way by the railroad company, and as a result of said fall, inflammation and blood clot resulted and as a proximate result thereof it became necessary to amputate the left leg.

It is further alleged upon information and belief that plaintiff had a preexisting susceptibility to vascular trouble and that said susceptibility prior to the accident was latent and had not manifested itself prior to said accident; and that the negligence of the defendant railroad company caused the latent condition to become active and to be aggravated into a condition of infection and thrombosis of the left leg.

Between the first and second trial plaintiff sought and obtained leave of the court to file a supplement to the fourth cause of action as set forth in the amended complaint, wherein it was similarly alleged it became necessary to amputate plaintiff's right leg above the knee.

The answer denied the foregoing allegations, and as an affirmative defense set up contributory negligence, and assumption of risk.

The record before us consists of a transcript of some 1900 pages, and briefs of approximately 400 pages upon the part of respondent, and approximately the same by appellant, where is ably presented the contentions of respective counsel. We mention this to show our difficulty in reducing a recital of the facts and analysis of the law to a reasonable limit in this opinion.

Setting forth, therefore, the facts as succinctly as is possible under the circumstances, we find that respondent Smith, on the 5th of October, 1934, was engaged as a brakeman for the Western Pacific Railroad Company. He had been a railroad man for twenty years, and had been working for appellant railroad company somewhat over ten years. He had been promoted to the rank of conductor, but worked mostly as a brakeman. His average earnings were about $185 a month.

During the ten years with the Western Pacific Railroad Company he had never lost any time from work by reason of sickness, and prior to October 5, 1934, had never been in the hospital by reason of sickness or illness. His physical condition was excellent and he had no difficulty at any time in performing his work. He had been active in outdoor life and had often engaged in such strenuous sports as fishing and hunting in the Plumas country. He testified that he had never felt any pain or disability in either of his legs prior to October 5, 1934, excepting that in 1933 he fell from a box car at Greenville and bruised his ankles but they only bothered him for two or three days and he did not spend any time in the hospital by reason of the accident and had had no medical treatment as a result thereof. At the trial, neighbors and business associates of plaintiff testified that they knew Mr. Smith and that they had not seen him limp and as far as they could see plaintiff had no external evidence of any physical trouble. So also, was it testified to by members of the train crew with whom he worked.

About 10 o'clock on the evening of October 5, 1934, respondent reported for work as a brakeman on a run going up the Feather River canyon from Oroville to Portola. The train consisted of about sixty freight cars, on which he was the rear brakeman and flagman, and was stationed on the caboose. Among other duties he was to protect the rear end of the train as a flagman while on the main line, and when the train pulled onto a passing track it was his duty to line up the switches and derails. At Cresta, some forty miles east of Oroville, is a passing track or siding, a section house, a trackwalker's house, a house for the section foreman, and bunk houses for the section men. No one lives at this point but employees of the Western Pacific Railroad Company, and there is no roadway or other means of approach but by a roadbed of the railroad. On this particular evening this train was ordered to meet a west bound passenger train at Cresta. After the passenger train had passed, respondent, as was his duty, checked the switches including the derail switch, which was about 110 feet east of the caboose. In order to expedite the movement of the trains it was the custom for the freight train to slowly start as soon as the main line was clear. This required plaintiff to run for the caboose. The most natural place for him to run was between the two tracks,

the main track and the passing track, because it was smoother there than between the rails. While so running at this time plaintiff alleges that he tripped over a discarded angle bar, which was imbedded in the ground between the two tracks, causing him to fall forward prone upon the ground. An angle bar is a piece of steel about two feet long so formed to fit against the rail and it is used to connect the ends of the rails together.

The evidence reveals that the section foreman inspected the track during daylight hours for a distance of five miles every Sunday and Thursday, which beat included the tracks at Cresta. In addition to the inspection by the section foreman a regular trackwalker made a night inspection of the roadbed and the equipment each night. Both these men testified that it was their duty to look for such obstructions as are here involved and stated that they never saw the particular bar in question. The section foreman testified that if such a bar was imbedded as testified by plaintiff it would have to have been there a long time.

Respondent further testified that after his fall he raised himself from the ground, picked up his lantern and proceeded to overtake the caboose. Just after the fall he had a very severe pain in the calf of his left leg and the instep just at the base of the toes and from there up to about his ankle. After he got on the caboose platform the pain still continued. He then told Lawrence, a fellow brakeman, that he had fallen and hurt his leg, and Lawrence then massaged the leg, and later, to assist him, his fellow employees lined up the switches for respondent. Lawrence denied, although rather inconclusively, that Smith told him he had received an injury, although admitting he massaged the leg and that he later lined up the switches for Smith. An examination of the left leg did not indicate an injury except for a bruise about six or eight inches below the knee on the outside of the calf. Respondent, although having fallen and suffered this pain, did not file an accident report,—his reason for not doing so was that he thought the injury did not amount to much and would soon heal. Furthermore he did not want to be compelled to lay off as he wanted to keep on working. On October 9th, however, he went to see the company doctor who told him it was nothing serious. Respondent also gave as his reason for not reporting the accident that he was personally ac-

quainted with the section foreman, and a complaint might cause the foreman to lose his job. On the next morning when the respondent returned on the run he saw the angle bar imbedded where it was when he tripped the night before. He saw it from the caboose platform as they were passing Cresta.

There was a further reason for not reporting the accident. Plaintiff testified that after a few days the members of the train crew became very much worried about their failure to file an accident report as required by rules 1184 and 1185 of the railroad. These rules require prompt report of accidents and detailed forms to be made out. The rules of the company were very strict about failure to report accidents in such manner. It was testified, however, by at least one member of the crew that many times if a man was superficially hurt he would say nothing about it in order to avoid the necessity of the crew making the elaborate reports, and that railroading was a rough employment, and if a man got a trivial injury he ordinarily did not make any fuss about it. At the trial the members of the crew denied, or were vague about any injury sustained by Smith, but it is argued by counsel, and perhaps plausibly so, that having failed to make the report, the train crew would be subject to penalties if they knew of an accident and had failed to report the same. In fact it might easily result in their dismissal from the railroad service. So also would an admission by the section foreman or the trackwalker of the presence of the angle bar on the roadbed.

The pain in the foot continuing, respondent went to the company hospital at Portola on October 9th, and called on Drs. McKnight and Coulter, and told Dr. Coulter that he had fallen while running for the caboose. At that time Dr. Coulter apparently did not consider the matter very serious, and told him it was probably a sprain of the muscles. The next day respondent saw Dr. Kusel, another railroad doctor, at Oroville. He told Dr. Kusel that he had fallen while running for the caboose and had immediately thereafter suffered some pain. Dr. Kusel told him he did not think it amounted to a great deal. He called on Dr. Kusel October 18th, 19th, 22d, and 23d. The doctors' reports were somewhat vague in regard to the history given them by respondent, and they were not very certain as to what information they had from Smith.

Dr. Coulter diagnosed the trouble at that time as "questionable Raynaud's disease".

Respondent continued to work from the 5th to the 17th of October, during which time the members of the train crew assisted him as much as they could in his duties, but on October 18th, the pain became so intense that he was unable to report for duty. On October 25th, he went to the hospital at Portola where he again saw Dr. McKnight and Dr. Coulter. They then arranged for him to enter the railroad hospital in San Francisco. They also instructed the porter of the train in Smith's presence, to keep his leg in a bucket of chipped ice on the way to San Francisco. Upon arriving at St. Joseph's Hospital in San Francisco, plaintiff there met Dr. Kilgore, and gave him the history of his fall on the right of way. He was assigned to a room. Smith at that time was the holder of an accident insurance policy, and asked the doctor to report the same for him, but Dr. Kilgore told him he thought his condition was due to some disease and not accident, and refused to sign the blanks for an accident policy. Due to Smith's need for immediate funds, so he testified, he finally accepted the theory of Dr. Kilgore and filed his insurance policy for illness and not accident. It should be noted that the several doctors denied having received any history from Smith as to a fall, as Smith said he did, but that merely created a conflict in the evidence which the jury resolved in favor of plaintiff.

In regard to the history which was obtained at the hospital, the interne whose duty it was to take the case history of the patient, testified he did not take down *verbatim* what was stated to him by Smith but took down such things as would be of medical interest and not for a legal record. He had an entry of a sprained ankle some two years previously, but did not know how the injury was occasioned. Nor did he have anything in the record to indicate whether or not the pain was caused by the falling over an angle bar or the falling off of a caboose, or how it happened. As he said all he was concerned with at the time was the record of the pain, and was not interested in what may have brought it about.

Upon arriving at the hospital the pain was confined to respondent's left leg. His condition, however, did not improve. Gangrene set in, and the left leg was amputated on November 26, 1934, about nine inches below the hip. A dis-

section of the popliteal artery of the amputated left leg showed almost black blood clots of about the consistency of new rubber, definitely stopping the flow in that artery. From this dissection and his prior study of the case, Dr. Kilgore diagnosed the case as one of "Buerger's disease", and came to the conclusion that the plaintiff had been suffering from such a disease for about one and a half years, and that he was definitely suffering from that disease on October 5, 1934.

Dr. John P. Degnan, a witness called by defendant, testified that he first saw plaintiff in November, 1934. That he had been retained by some of the railroad men at Portola to examine the leg of Mr. Smith. At that time the patient was under the influence of opiates and in very severe pain, and he could not get a complete history, but was able to learn that he had fallen and hurt his left leg in the region of the knee, and immediately afterward it had so pained him that he had to quit work shortly thereafter. He also told the doctor that he had stumbled over an iron on the right of way. It was the opinion of this doctor that Smith's condition was due to an injury which had caused the blood vessels to be blocked, and if the patient did have Buerger's disease prior to October it was quiescent, and an injury of the kind described by the plaintiff would excite the condition, and the injury would be the exciting cause of clot formation and blockage.

After the amputation of the left leg respondent left the hospital about the middle of December, 1934. He then applied for a job with the railroad company, and he was given temporary work in a watch tower in Oakland. The distance he had to walk to his work and the climbing to work in the tower so irritated the stump of his leg that after about three weeks he was compelled to quit. Also the pain at night kept him awake so that he was in danger of falling asleep on his job and he did not want the responsibility of being in a watch tower under those conditions.

About April, 1936, plaintiff testified that he began to have trouble with his right leg, starting with pain in the bottom of the right foot which gradually extended up into the leg. He entered the Providence Hospital in Oakland on April 24, 1936, and on June 27, 1936, his right leg was amputated. Dr. Ruedy, who performed the operation on the right leg in the Oakland hospital described in some detail the characteristics of Buerger's disease and explained it was a disease which

involved both legs; in other words, it was bi-lateral, and that the loss of the right leg was due directly to the disease which developed in the left leg.

It will be recalled that Dr. Coulter, in his original diagnosis of the case in October, 1934, classified it as "questionable Raynaud's disease". Raynaud's disease is one that embraces circulation and is functional rather than organic. It is due to a cerebral disturbance, acting on the vascular constrictors and vascular dilators. It involves constriction of the blood vessels and may be transitory if the causative mental factor is removed. In this disease if an emotional person was subject to extreme worry, it would have a constrictive effect upon the arteries. An illustration of this as cited by the doctor was the blanching of a person's face when confronted with a sudden danger, which took place without any physical contact or physical injury, but was a natural and emotional response by constriction. Buerger's disease is an inflammatory infectious disease of the blood vessels, and when occurring in the legs affects both.

The evidence reveals long and involved hypothetical questions asked of the various medical witnesses, which are too long to be here set forth or even summarized. The deductions of the medical witnesses called by the plaintiff, however, were to the effect that an injury such as that sustained by plaintiff, if such an injury was sustained, would have a direct effect upon an existing Buerger's disease. A person might have Buerger's disease, they testified, but may develop a collateral system of circulation around the diseased point in the artery. Such secondary or collateral system of circulation would be entirely adequate, unless or until some outside cause interfered with such secondary system, blocking adequate circulation, causing gangrene. Such an injury would then be, and in this case was, they testified, the primary, direct causative factor of the painful symptoms and conditions of Buerger's disease in the left leg, and later extended to the arteries in the right leg.

Many pages of the briefs and considerable time on oral argument were devoted to a learned and technical discussion of Buerger's disease and of Raynaud's disease, and while of great assistance to the court to a better understanding of the theory of counsel, we need not here go into that feature of the case in greater detail.

Let us turn to a consideration of the law. ▮ The principal contention of appellant is that the evidence was insufficient to support the verdict, and although the rule of federal practice is here applicable we can see little difference between the federal rule and the familiar rule in such situations as is applied by the courts of California. In *Gaja* v. *Reick-McJunkin Dairy Co.*, 18 Fed. (2d) 279, the federal rule is given and is essentially the same as under our state practice.

"In determining the propriety of the directed verdict for the defendant, we must take that view of the evidence and the inferences reasonably and justifiably to be drawn therefrom, most favorable to the plaintiff, and determine whether or not under the law a verdict might be found for plaintiff. . . . Neither we nor the trial judge can rightly pass upon conflicting testimony, or determine the credibility or preponderance thereof." ·

In other words it is not the function of the court to weigh the evidence, but only to determine whether or not there is substantial evidence to sustain the verdict. Of course a verdict must be based on substantial evidence and not on surmise, conjecture or speculation. But if reasonable men may fairly differ as to whether certain evidence establishes a fact in issue then such evidence must be considered as substantial.

▮ Plaintiff testified he tripped over an angle bar, partially buried in the dirt and ballast of the roadbed. He testified he saw it immediately after he fell, and again the next morning from the caboose on the return trip. It is true the section foreman and the trackwalker testified they had never seen such a bar there, and if it were there it would have been their duty to remove it. The jury have concluded it was there and accepted the testimony of plaintiff. We are bound to assume that it was there as there was substantial evidence of that fact in the record. ·

▮ There is no proof that the railroad company had actual knowledge of the existence of the angle bar upon the right of way, so plaintiff must establish the same by constructive notice. To do that it was testified to by plaintiff that the bar was imbedded in the ballast,—that it was rusty,—that it was found in a place not frequented by strangers, far from any highway, camps or dwellings of persons not connected with the railroad, and not frequented by travelers of any kind. The section foreman testified that if it was there and imbedded

in the gravel as described by Smith, it would have had to have been there a very long time. Those facts would tend to indicate negligence on the part of the railroad in failing to furnish plaintiff with a safe place wherein to work. A railroad is under a duty to use ordinary care to provide its employees with a safe place wherein to work. (*Thomas* v. *Southern Pac. Co.*, 116 Cal. App. 126 [2 Pac. (2d) 544]; *Haskins* v. *Southern Pacific Co.*, 3 Cal. App. (2d) 117 [39 Pac. (2d) 895].)

Appellant claims the presence of the angle bar upon the right of way, lying between the main and passing tracks, was not sufficient to justify a finding of negligence, actual or constructive. In support of this contention they cite and rely, among others, upon *Patton* v. *Texas & P. R. Co.*, 179 U. S. 658 [21 Sup. Ct. 275, 45 L. Ed. 361]; *Ewing* v. *Goode*, 74 Fed. 442; *Missouri K. & T. Ry. Co.* v. *Jones*, 103 Tex. 187 [125 S. W. 309]; *Frebes* v. *Michigan Central R. R. Co.*, 218 Mich. 367 [188 N. W. 424]; *Matthews* v. *Southern Pac. Co.*, 15 Cal. App. (2d) 36 [59 Pac. (2d) 220]; *Wright* v. *Atchison T. & S. F. Ry. Co.*, 170 Okl. 48 [38 Pac. (2d) 517]; *Atchison T. & S. F. Ry. Co.* v. *Saxon*, 284 U. S. 458 [52 Sup. Ct. 229, 76 L. Ed. 397]; *Connors* v. *Cranford Co.*, 146 App. Div. 530 [131 N. Y. Supp. 148].

In the Patton case, *supra*, a fireman attempted to step from the engine, and because of a loose nut on the step, it turned, throwing him against the wheels. It appearing, the court said, that the employer furnished suitable appliances in good condition, and it being impossible to explain what caused the step to be loosened, a jury could not conjecture as to the cause for the loosened nut. In *Ewing* v. *Goode*, *supra*, plaintiff produced evidence consistent with an hypothesis that defendant was not negligent, and also that he was negligent; so it was held plaintiff has proven neither. In *Missouri K. & T. Ry. Co.* v. *Jones*, *supra*, a switchman, getting from an engine, slipped on a large bolt of a type used by car repairers. The court held that it could not be determined from the facts whether some employee had put the bolt there or negligently allowed it to remain, or that it had remained there long enough to raise an inference of a want of care.

In *Frebes* v. *Michigan Central R. R. Co.*, *supra*, the court held there must be either actual or constructive notice of the danger and a reasonable opportunity to remove it before an

employer can be charged with actionable negligence. A similar rule was applied in *Matthews* v. *Southern Pac. Co., supra.*

In *Wright* v. *Atchison T. & S. F. Ry. Co., supra,* the plaintiff testified he saw "what looked like a stake". The court held plaintiff had failed to show there was a stake or that one had been placed upon the right of way by the company. The cause of the accident was open to conjecture. Such also was the situation in *Atchison T. & S. F. Ry. Co.* v. *Saxon, supra.* In *Connors* v. *Cranford Co., supra,* where plaintiff was injured by a nail in a plank, it was held there was no evidence from which it could be adduced how long the nail had remained in the plank. The court said "such fault would have been shown had the plaintiff proved that prior to the accident the defendant or his agent had knowledge of the protrusion of the nail, or that it had been in that situation for such a length of time that the defendant should have known of it".

In the case of *Poe* v. *Illinois Cent. R. Co.,* 335 Mo. 507 [73 S. W. (2d) 779], a judgment was reversed on the ground of insufficiency of the evidence to show notice to the defendant of the construction complained of. There, plaintiff fell over a pile of gravel on the right of way but it was not shown how long the gravel had been there. As the court said, it might have fallen from a passing train a very short time before.

Appellants compare the situation at Cresta to that at Lemoore, where Matthews (15 Cal. App. (2d) 36 [59 Pac. (2d) 220]) was hurt, but Cresta is a siding in the Feather River Canyon, far removed from the public, whereas the switch at Lemoore was in a town near a depot, a packing house, a warehouse, and subject to all the travel a railroad right of way receives under such circumstances.

Appellant also points to the testimony of the trackwalker, the section foreman and the members of the train crew to show that no angle bar was imbedded in the gravel of the right of way, and that no complaint was made by plaintiff to his fellow employees. However, the jury were the judge of the credibility of the witnesses, and they have chosen to accept the statement of the plaintiff and his witnesses. No criticism can be made of that nor the fact that the trial court seems to have been sufficiently impressed with the truth of plaintiff's case to deny a new trial. The jury may have considered

the self-interest of the employees sufficient to affect the testimony of the witnesses.

As to the medical phase of the case, the rule is recognized in all jurisdictions that an accident which aggravates a preexisting disease may constitute a cause of action for damages. In such a case plaintiff may recover all damages for such aggravation. We find that rule first laid down in *Campbell* v. *Los Angeles Traction Co.*, 137 Cal. 565 [70 Pac. 624], and followed in such cases as *Perry* v. *McLaughlin,* 212 Cal. 1, 11 [297 Pac. 554]; *White* v. *Red Mountain Fruit Co.*, 186 Cal. 335 [199 Pac. 318]; *McGeorge* v. *Nelson Co.,* 107 Cal. App. 148 [290 Pac. 75]; *Diebler* v. *Wright,* 119 Cal. App. 277 [6 Pac. (2d) 344]. Here the medical witnesses for plaintiff testified directly that the accident aggravated a previous quiescent and dormant condition and caused the chain of circumstances to be set up, which resulted in the amputation of both legs of plaintiff. Such causal connections were accepted in *Latky* v. *Wolfe,* 85 Cal. App. 332 [259 Pac. 470]; *Ward* v. *Read,* 219 Cal. 65 [25 Pac. (2d) 821]; *Dow* v. *City of Oroville,* 22 Cal. App. 215 [134 Pac. 197]; *Groat* v. *Walkup Drayage etc. Co.,* 14 Cal. App. (2d) 350 [58 Pac. (2d) 200]; *Foley* v. *Northern Cal. Power Co.,* 165 Cal. 103 [130 Pac. 1183]; *People* v. *Bowers,* 2 Cal. Unrep. 878, 18 Pac. 660.

In *Cobb* v. *Spokane P. & S. Ry. Co.,* 150 Or. 226 [44 Pac. (2d) 731], the court was considering a situation in many respects similar to the case at bar. It there said:

"At the time of the accident plaintiff was affected with what is known as 'Buerger's disease', a disease of the veins and arteries, and so affecting circulation, usually in the extremities. Plaintiff was unaware that he had the disease and had never been bothered with it. The disease is bilateral, usually affecting both legs or limbs at the same time, but plaintiff had had no trouble with his left or uninjured foot. It is asserted that a blow is dangerous to one afflicted with this disease and is liable to result in infection or gangrene. Trauma is generally the cause of amputation in these cases, and amputations are much more to be expected when the blow injures a vein or artery."

As first indicated the industry and ability of counsel have raised many questions, and to attempt to analyze all of these collateral questions would extend this opinion to unreasonable lengths. What we have said, we believe, is determinative of

this appeal. The case was ably tried, and the testimony, although conflicting, was properly received, and the jury with it all before them, found for the plaintiff.

No error appearing sufficiently serious to justify a reversal, the judgment should be affirmed, and it is so ordered.

Thompson, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on January 30, 1939, and an application by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on February 27, 1939.