[Crim. No. 2079. In Bank.—March 1, 1918.]

# THE PEOPLE, Respondent, v. THOMAS J. MOONEY, Appellant.

CRIMINAL LAW—MURDER—APPEAL — JUDGMENT OF DEATH — JURISDICTION OF SUPREME COURT.—The jurisdiction of the supreme court, in "all criminal cases where judgment of death has been rendered," is specially limited by section 4 of article VI of the state constitution to appeals "on questions of law alone," which means that an appeal in such case is allowed solely for the purpose of obtaining the determination of the appellate court as to whether there has been any error in the proceedings of the trial court.

ID.—RECORD—QUESTIONS TO BE REVIEWED.—In such case the appellate court is confined to the record sent up to it from the trial court.

ID.—EVIDENCE—CREDIBILITY OF WITNESS—QUESTION FOR THE JURY.—In a case where judgment of death was fixed by the jury as the penalty following a verdict of murder in the first degree against a defendant charged with having caused the exploding of a bomb, by which a young woman was killed on a public street, together with a number of other persons participating in a public parade, argument that a witness could not have seen persons and movements described by him, because of an intervening crowd, has no place in an appellate court, the question whether or not the witness was telling the truth being a matter peculiarly for the jury.

ID.—CONFLICTING OR INCONSISTENT STATEMENTS.—Conflicting statements of witnesses or even inconsistent statements of the same witness will not justify a court of review in rejecting all the story of a witness or witnesses after a jury has acted on a part of it.

ID.—EVIDENCE SUPPORTING VERDICT.—In the instant case the evidence is reviewed and found to be ample to support the verdict.

ID.—FRAGMENTS OF BOMB—BALL-BEARINGS—ADMISSIBILITY IN EVIDENCE. A ball-bearing found by one witness on the street shortly after the explosion, warm and with blood on it, and a fragment of another ball-bearing found by another witness, about the same time, with the fractured part bright as if from a very recent break, indicating that a great force had been applied to the metal recently, were properly admitted in evidence, the circumstances justifying the conclusion that they had formed parts of the bomb.

ID.—ADMISSIBILITY OF EVIDENCE GENERALLY.—The tendency of modern decisions is to admit any evidence which may have a tendency to throw any light on the transaction in controversy, or give any weight in determining the issue, leaving the strength of such evidence or the amount of such weight to be determined by the jury.

ID.—CONSPIRACY—EVIDENCE FOUND SUFFICIENT TO ESTABLISH.—Evidence found sufficient to establish a conspiracy between the defendant and a third person who had been previously convicted of murder accomplished by the same explosion.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco, and from an order denying a new trial. Franklin A. Griffin, Judge.

The facts are stated in the opinion of the court.

Maxwell McNutt, and John G. Lawlor, for Appellant.

U. S. Webb, Attorney-General, John H. Riordan, Deputy Attorney-General, C. M. Fickert, District Attorney, and Edward A. Cunha, Assistant District Attorney, for Respondent.

THE COURT.—The defendant, Thomas J. Mooney, was convicted of the crime of murder in the first degree, the jury fixing the death penalty as punishment for said crime. After denial of his motion for a new trial by the trial judge the defendant was sentenced to be hanged. This appeal is from the judgment and from the order denying his motion for a new trial.

On July 22, 1916, a preparedness parade was in progress in San Francisco, thousands of patriotic citizens being participants therein. During its progress and while a portion of the parade was passing the corner of Steuart and Market streets a bomb was exploded, killing a number of people and wounding many more. One of the victims was Hetta Knapp, and the defendant was indicted for and convicted of her murder. Other persons were also charged with these murders and one, Warren K. Billings, was convicted, prior to the trial of defendant Mooney. On appeal to the district court of appeal his conviction was affirmed and he is now undergoing life imprisonment. (*People* v. *Billings,* 34 Cal. App. 549, [168 Pac. 396].)

Pending this appeal a motion was made which purported to be a motion for a reversal. This motion was based not upon the merits but was founded primarily upon the fact that the attorney-general, believing from evidence which had been discovered after the conviction and after the order denying

defendant's motion for a new trial that a new trial should be had, sought to stipulate with the counsel for defendant for a reversal of the judgment and order. This motion was denied, and as it is important in this and in all cases to keep in mind the functions of the supreme court, we deem it proper to quote from the opinion pronounced upon the denial of that motion. (*People* v. *Mooney*, 176 Cal. 105, [167 Pac. 696].) In that opinion the following language was used: "By express provision of our constitution, the jurisdiction of both the supreme court and the district courts of appeal in criminal cases is specially limited. As to the supreme court, 'appellate jurisdiction on appeal from the superior courts' is given 'on questions of law alone, in all criminal cases where judgment of death has been rendered.' (Const., art. VI, sec. 4.) This is our only jurisdiction. The provision means that an appeal in such cases is allowed solely for the purpose of obtaining the determination of this court as to whether there has been any error of law in the proceedings of the trial court. We have no other questions to determine, and may lawfully determine no other question. If we find no substantial error of law, we must affirm the judgment of the lower court. It is clear, too, that in the consideration of such an appeal, for this limited purpose, we are confined to the record sent to us from the court below. This was very clearly stated by this court in the first decision of the case of *People* v. *Bowers*, 2 Cal. Unrep. 878, [18 Pac. 660], where it was sought to have this court take into consideration what purported to be the written confession of another that he was the guilty party, made after the taking of the appeal. The court said that, if the events occurred as stated in the brief of the appellant's counsel, the facts would entitle the defendant to a new trial on the ground of newly discovered evidence, if presented in time to the court below, but that they were not so presented, and could not be so presented, because they occurred pending appeal. Because it so clearly states what is obviously the law on this subject, we quote from the opinion: 'While it is admitted by counsel for appellant that ordinarily no argument could be made here upon facts occurring after appeal taken, it is urged that the evidence which has been discovered in this case "is of so grave a character, and points so strongly to the innocence of this defendant, that, however informally it may have

come to the attention of the court, this or any other court of competent jurisdiction should say that he shall not be executed until it shall have been submitted, in common with other evidence in the case, to a jury of his country.'' But, manifestly, the court has no authority to consider these matters as thus presented. They are no part of the record sent to us from the court below, and there is no provision of law by which newly discovered evidence may be presented to this court in the first instance. The remedy in such cases rests with the executive. He alone can afford relief.' ''

The cause is now before this court on the merits of the appeal, and we shall proceed to examine the record in accordance with our duty as outlined above and to consider the various assignments of error and the arguments thereon presented by counsel in the case for defendant and for the state of California.

Defendant's counsel at the outset freely admit that Hetta Knapp was the victim of a foul murder. Indeed, they introduced evidence for the avowed purpose of proving that the explosion was caused by a bomb, but not of the sort which, according to the evidence offered by the people, brought death to her. In other words, the only sort of explosive with which the prosecution sought to connect the defendant herein was concealed in a suitcase or valise deposited on the sidewalk near the southwest corner of Steuart and Market Streets, while defendant's counsel sought to prove that the murders were perpetrated by means of a bomb hurled through the air and exploded upon contact with the sidewalk.

The appeal is based upon the alleged insufficiency of the evidence to support the verdict and upon asserted errors of law alleged to have been committed in the admission and exclusion of testimony.

The record shows without conflict that near the hour of 2 o'clock on July 22, 1916, there was in progress upon Market Street, one of the principal thoroughfares of the city of San Francisco, a great procession known as the ''Preparedness Parade.'' Thousands of persons, moved by patriotic impulses, participated in the parade, and other thousands gathered on Market Street and other avenues upon the line of march to witness the pageant. Suddenly came the death-dealing explosion, and among the victims was Hetta Knapp, who was killed by a fragment from the bomb.

Before reviewing the evidence which, according to the contention of the attorney-general, connects the defendant with the perpetration of the crime, we will examine that upon which the prosecution depended to support the theory that the explosive was contained in a suitcase and operated by some sort of time device which took effect after the container had been deposited on the sidewalk near the line of a building at the corner of Steuart and Market Streets; because defendant's counsel earnestly contend that the "suitcase theory" was unsupported while their theory of a thrown bomb was absolutely established. By testimony which we shall have occasion to treat more in detail in the course of this opinion a suitcase was described as being in the possession of Mooney and of his codefendant, Billings, shortly before the explosion near the scene of the crime. Immediately after the explosion an indentation in the sidewalk and one in the wall of the building were evident. On the street and sidewalk were found cartridges, loose bullets, cartridge shells of three calibers, namely, 22, 32, and 38, pieces of four-inch wrought-iron pipe and parts of a malleable-iron cap of the same measure as the pipe. Some pieces of pipe were hurled several hundred feet. Across Steuart Street, on the roof of a building, two pieces of brass wire were found. These, according to the testimony of an expert witness, were winders of alarm clocks, but could not have belonged to the same clock. Near the same place was discovered a ring, which, according to expert testimony, might have been the supporting ring of a clock. Some fragments of fiber of the sort used in the manufacture of cheap suitcases, as well as some small pieces of leather, were picked up near the situs of the explosion, and that which appeared to be the handle of a cheap suitcase was found shortly after the explosion on the opposite side of the street, while on the roof of a building across the street small pieces of a valise frame were discovered. A ball-bearing five-eighths of an inch in diameter and part of another ball-bearing of the same size were found on the day of the murder in Steuart Street. In the bodies of some of the victims were bullets of 32 and 22 caliber; a piece of a cartridge shell was found in the body of one of the persons who were killed and fragments of pipe were in the bodies of other victims. Other pieces of pipe fell near witnesses who produced these particles. It

was argued, and we think with reason, that these pieces of pipe formed part of the container of the explosive material used in the manufacture of the bomb. At the trial there were produced a 22-caliber rifle, some cartridges to fit it, a pistol loaded with 32-caliber cartridges and some ball-bearings, which, according to the testimony, had been found in the room occupied by Billings. In Mooney's home, according to the testimony, were found a pistol and 38 and 32 caliber cartridges.

Appellant's counsel say that, granting, for argument's sake, that Billings placed a suitcase at about the place where the explosion subsequently occurred and that thereafter no suitcase was found but fragments of one were discovered, there is no evidence that the suitcase contained the explosive or that it was detonated by means of a time device. With this contention we cannot agree. All of the circumstances outlined above point to a corroboration of the theory of the prosecution. Mrs. Kennedy, a witness called by the prosecution, testified that just before the explosion occurred she saw a suitcase on the sidewalk against the wall of the building. It seemed to be larger than the ordinary suitcase which a traveler usually carries on a journey. It was noticed by the witness two or three minutes before the explosion, and it occupied the place where the hole or depression in the sidewalk caused by the said explosion afterward appeared.

T. K. Stateler, general agent of the Northern Pacific Railway, was participating in the parade with the Grand Army of the Republic. This organization moved out of Steuart Street to join the parade, but before the old soldiers marched out of Steuart Street, Mr. Stateler, according to his sworn testimony, saw a suitcase exactly at the place afterward indented by the force of the explosion. He said that his attention was directed to it because he was tired and he thought of sitting upon the suitcase while waiting for his post to move but finally he selected another place to sit because he would not like to have anyone use his own suitcase for a seat. He estimated the time which elapsed before leaving Steuart Street to move with his command as about ten minutes. He had marched about two hundred feet down Market Street when he heard the explosion.

James McDougall, a lad of thirteen years of age, was in the parade carrying a streamer attached to the banner of the

First California Volunteers. At the time of the explosion
this regiment was going out of Steuart Street into Market
Street. About ten minutes before marching the lad saw, as
he testified, a suitcase at the place where afterward he ob-
served the hole made by the explosion. He thought it was
"kind of funny that a suitcase would be there that day of the
parade." He described it as being of the usual length but
somewhat wider than the ordinary suitcase and light brown
in color.

It will thus be seen that the physical facts as described
by the witnesses support a conclusion that the explosive was
fired from within a suitcase or valise, and if the testimony
tending to establish such facts was credited by the jurors
(as undoubtedly it must have been), it formed a sufficient
basis for the verdict. But in addition to the physical facts
disclosed by the testimony and the exhibits there was testi-
mony connecting the defendant with the possession of a suit-
case shortly before the explosion and tending to show conduct
on his part indicative of a consciousness that the said suit-
case contained something the possession of which made him
apprehensive of detection by the police.

One of the witnesses, John MacDonald, testified that he
arrived at the southeast corner of Steuart and Market
Streets about twenty minutes to 2 o'clock P. M. He stood
twelve or fifteen feet off of Market Street, on Steuart.
Shortly after he took this station he saw Warren K. Billings,
Mooney's codefendant, coming on Steuart Street toward
Market Street from the direction of Mission Street. Ac-
cording to this witness, Billings carried a suitcase which he
placed upon the sidewalk against the wall of the building
near the corner. Asked to describe the actions of Billings
as he approached the corner the witness said: "Well, he was
carrying the suitcase and his head was working on a pivot,
and he looked all excited as if he was worrying about some-
thing. That is what called my attention to him first."
After depositing his burden on the sidewalk Billings walked
to the corner and pushed open the door of a saloon. At that
instant Thomas J. Mooney, the defendant, came out of the
saloon and then he and Billings stood on the sidewalk talking.
Mooney pulled out his watch, looked at it and looked toward
the Ferry Building at the eastern extremity of Market Street.
Then, according to this witness, Billings left his companion

and was soon lost to MacDonald's sight in the crowd. Mac-
Donald's attention was then, he said, called back to Mooney,
who took out his watch again, put his hand to his face as if
in study, and "looked alongside the building." He then
turned, passed through the crowd, and was lost to the sight
of the witness. MacDonald also testified that the suitcase
was placed upon the exact spot which was afterward in-
dented by the explosion. Witness said that the suitcase was
left by Billings "about 2 o'clock." After Mooney went
away, as the witness testified, the latter walked very slowly
down Market Street to the Alameda Coffee House, about 150
feet distant, and upon his arrival there he heard the explo-
sion.

Another witness, F. C. Oxman, who stated that he was a
cattle dealer residing in Eastern Oregon, also testified re-
garding the happenings at and near the scene of the explosion.
He said that as he stood at the corner of Steuart and Market
Streets about fifteen minutes of 2 o'clock he saw an auto-
mobile driven by Israel Weinberg, in which Mooney, his wife,
Rena Mooney, and Billings were passengers; that the defend-
ant was on the front seat holding a suitcase on the running-
board; that Billings jumped excitedly and rapidly from the
rear seat; that he took the suitcase from Mooney; that an-
other man whom witness did not identify also jumped from
the rear seat and came on to the sidewalk near the place
where Oxman was standing; that this man took the suitcase
from Billings; and that then Billings and the other man
walked along Steuart Street in a direction away from Market
Street. Mooney, he said, stood near him and seemed to be
watching the other two men. He testified that Mooney
seemed very excited and by his manner attracted his
(Oxman's) attention; that after Billings and his companion
had gone some distance the former took the suitcase and set
it down on the walk by the side of the building; that they
then returned and went in the door of the building—he was
not sure whether all of them did so or not; that directly
they came out and Mooney said: "Give it to him and let him
go; we must get away from here; the bulls will be after us."
Further testifying, Oxman said that Billings gave something
to the other man, who then departed; that Billings first and
then Mooney went to Weinberg's automobile; that Mooney,
after Billings left him, looked at his watch, glanced over to

the place where the suitcase was, and then followed Billings to the motor car. The vehicle then turned into Steuart Street and went up that street.

It is argued by counsel for defendant that MacDonald could not have seen the people and their movements described by him because 'of the crowd between him and the opposite side of the street. While such an argument may be properly addressed to a jury, it has no place here. Whether or not the witness was telling the truth was a matter peculiarly for the jury.

But counsel insist that the stories of these two witnesses are so inconsistent that they could not possibly have been testifying about the same persons. Their stories, counsel say, are self-destructive and, therefore, a verdict based in part upon their testimony should be set aside. Even if their stories were vitally contradictory, it would not follow that this court could disturb the judgment. Inconsistencies in the details of statements of witnesses may be looked for. Truthful witnesses may be expected to agree substantially but to differ circumstantially in their attempts to describe the same occurrence. Even inconsistencies in the different parts of the testimony of a witness would not justify a court of review in rejecting all·of his story after a jury had received and acted upon a part of it. As Mr. Justice Henshaw said, in delivering the opinion of this court in *People* v. *Durrant,* 116 Cal. 179–200, [48 Pac. 75, 79] : "If a witness should absolutely discredit his own testimony by swearing to opposite statements so that one or the other must be false, under our laws his testimony is not of necessity to be rejected. It is still evidence in the case. Under such circumstances the jury must receive and weigh it. They are bound to look upon it with suspicion and distrust, and *may* reject it. But, upon the other hand, they may as they determine accept as true one or the other of the contradictory asseverations. Thus, upon a review of the evidence by this tribunal, we may not examine with minuteness claims that witnesses are discredited, or that their testimony is unworthy of belief, or look to see whether some other conclusion might not have been warranted by the evidence. (*Blythe* v. *Ayers,* 102 Cal. 254, [36 Pac. 522].) *Ad quæstiones juris respondent judices, ad quæstionem facti respondent juratores;* and than

this no maxim of the old law has been more carefully preserved in its integrity under our system.''

But we do not see that the stories of these witnesses are so utterly incompatible as counsel would have us find them. It is quite within the bounds of reason that both saw parts of the same circumstances and occurrences but that Oxman saw more than the other witness could observe from the place which he occupied. But we cannot tell what may have been the exact mental processes of the jurors. For all we know they may have rejected all of Oxman's testimony and may have acted entirely upon that of MacDonald; or the reverse may have been true; or they may have credited parts only of the testimony of each witness. All that this court may do is to determine whether or not there is sufficient evidence of any sort to support the verdict, and we cannot escape the conclusion that it is amply supported.

While Oxman and MacDonald were the only witnesses who stated that they saw Mooney at Steuart and Market Streets near the time of the murders, there was other testimony which, if the jurors believed it, established the relationship of Mooney and Billings. In this case, as in the case of *People v. Billings*, 34 Cal. App. 549, [168 Pac. 396], witnesses testified that they saw Billings with a suitcase at 721 Market Street, less than four-fifths of a mile from the junction of Market and Steuart Streets, shortly before his arrival at the scene of the crime. Miss Sadie Edeau said that she saw Billings on the roof of the building at 721 Market Street. He had a suitcase in his hand and was leaning over the edge of the building. Witness, as she said, was standing on the sidewalk and after seeing Billings she moved to a place in front of the Kamm Building near by, and while there saw Mooney and his wife coming from the direction of 721 Market Street. She stated that the Mooneys rushed into the entrance to the Kamm Building and he placed something for his wife to sit upon; that at that time Billings was talking as he stood near the edge of the sidewalk to Police Officer Moore, whom the witness did not then know; that then Billings walked over and met Mooney near the middle of the sidewalk; and that then Billings and the Mooneys walked eastward toward the ferry and in the direction of Steuart Street. Then she saw Israel Weinberg get into an automobile which

stood near the place where Billings and the police officer had been standing. He drove away toward the east.

Herbert A. Wade, principal of a government school in Hawaii, testified that he was in the vicinity of 721 Market Street on the afternoon of July 22, 1916; that while he was looking into a showcase containing an exhibit of a dental office, Warren K. Billings passed him and went up the steps into the office; that Billings had a suitcase; that afterward witness saw a man and a woman there but could not identify them as the Mooneys.

Police Officer Earl R. Moore, as a witness, told the jury of seeing Billings in front of 721 Market Street shortly before the parade. Moore was clearing the street of automobiles in preparation for the procession. One car was standing near the curb and the officer sounded its horn in an effort to attract the attention of the owner. Finally Billings walked out to the sidewalk and in response to an inquiry said that he did not own the automoble but that the owner would be there "in a minute." At this juncture duty called the policeman away and when he returned the car had disappeared.

Mrs. Nellie Edeau substantially corroborated the testimony of her daughter, Miss Sadie Edeau, and said that after Mr. and Mrs. Mooney joined Billings she heard the latter say, "We have to make the ferry before 2 o'clock."

Peter Vidovich told of a visit to the office of a dentist at 721 Market Street on the afternoon of July 22, 1916, and of there meeting Billings as the latter was going up the stairway. Billings, he said, had a suitcase. He described it as resembling a drummer's sample case. By the testimony of George H. Speed, who described himself as the "secretary of the I. W. W.," the prosecution sought to establish the fact of communication between Billings and Mooney on the 19th of July, three days before the commission of the murders. He testified that, on that day, he carried a note from Billings to Mooney, who said he would meet the writer at the "Blast" office. The "Blast," as was developed on the cross-examination of Detective Sergeant Proll, was an anarchistic paper.

It will be seen from the review of testimony given above that both the manner of placing the deadly bomb and the defendant's guilty connection therewith find abundant support in the evidence. The defense introduced evidence tending

to contradict the showing of the use of a bomb concealed in a suitcase and also that of the presence of the defendant near the scene of the crime, but as the jury resolved this conflict of testimony against the defendant, we may not disturb the verdict. No principle of law is more firmly established than this.

Appellant's counsel, while conceding, as of course they must, that where conflicting testimony is given upon any matter pertinent to the questions at issue in a trial, this court is powerless to set aside the verdict of a jury, nevertheless contend that the showing of Mooney's absence from the corner of Steuart and Market Streets at the time when the suitcase was left there is so complete as to amount to a demonstration, and that, therefore, this court should reverse the judgment and order from which defendant has appealed. In this behalf they call our attention to the testimony of a witness for the people, Captain Matheson of the San Francisco Police Department, who, speaking of the time of the explosion, testified as follows: "It was at six minutes past 2. I happened to look at the clock in the Ferry Building and I looked at the clock in the saloon which had stopped at the time of the explosion." Mr. and Mrs. Mooney both testified that they spent all of the time after the head of the procession came in view and until the parade had passed on the roof of the Eilers Building at 975 Market Street, except a few moments during which the defendant went to his wife's studio in the building to get a newspaper. There was testimony which, if believed by the jurors, would have corroborated this account. Certain pictures were introduced in evidence. These were the work of a young man who photographed the people on the roof of the Eilers Building. Some of the photographs showed defendant at that place, which was more than six thousand feet from the corner of Steuart and Market Streets and more than seven thousand feet if a journey were made between the two places by way of Mission Street, which is parallel with Market Street. These pictures also show a clock on a building near by, and according to the time indicated Mrs. Mooney was on the roof at two minutes of 2 o'clock, and she and her husband were there at one minute after 2 and at four minutes after 2. Assuming that the clocks involved in the testimony were correct, we cannot see that the *alibi* is, as counsel for defendant contend,

scientifically established. All of the testimony regarding the
time when the suitcase was·placed on the sidewalk merely
approximated the hour. The length of time during which the
suitcase was seen by the witnesses who testified that they ob-
served it was estimated by them, and we cannot say that
within the estimates as given, if they were taken as sub-
stantially correct by the jury, the defendant could not have
proceeded by automobile from the scene of the purposed ex-
plosion to the Eilers Building and to the roof before the
operation of a time device to detonate the bomb. All of these
matters pertaining to the alleged *alibi* were before the jury.
It was for the jurors to say from the evidence whether or
not any real *alibi* was established.

Certain errors are asserted to exist by appellant's coun-
sel. These are based upon the admission of certain evidence.
A ball-bearing found in Steuart Street by witness Ormston
was properly admitted. It was found, as the witness testi-
fied, very soon after the tragedy in the immediate vicinity
of the explosion and it had blood on it and was warm. These
circumstances would justify a conclusion that it had formed
a part of the bomb. The fragment of a ball-bearing found
by witness Airola was also admissible. It was picked up
about fifteen minutes after the explosion and the fractured
part ·was bright as if the break were very recent. This
would indicate that a great force had been applied to the
metal very recently, and the jurors would be but following
the simplest logic if they found it to have been one of the
fragments of the bomb. The firearms and cartridges found
in the room occupied by Billings and the cartridges found
in defendant's room should have been admitted, as they
were. The cartridges found in Mooney's room were of the
kind and caliber of those picked up afterward at the scene
of the explosion. They indicated possession by the defendant
of the means for the perpetration of the crime. All of the
other alleged errors have been discussed in *People* v. *Billings,*
34·Cal. App. 549, [168 Pac. 396], and we again adopt the
ruling of the district court of appeal and the part of the
opinion relating thereto as follows:

"The fact that the cartridges found in the room of the
defendant after the commission of the crime were of the same
character and caliber of those found in the bodies of the
victims of the explosion was admissible, as tending in a meas-

ure to show that the defendant had the means at hand to commit the crime charged against him in the manner and by the means which it was shown were employed to commit the crime. (1 Michie on Homicide, pp. 851, 855, 857, 859; 21 Cyc. 945.)

"While it is true that no ball-bearings were found in the bodies of the victims of the explosion, nevertheless, the ball-bearings admitted in evidence were found, immediately after the explosion, in the midst of other things which, when considered in connection with all of the circumstances shown in evidence concerning the character of the explosion and its effects, apparently constituted a part of the bomb, and were, therefore, admissible as tending in some degree to show what were the constituent elements of the bomb. In this connection it may be noted that 'the tendency of modern decisions is to admit any evidence which may have a tendency to illustrate or throw any light on the transaction in controversy, or give any weight in determining the issue, leaving the strength of such testimony (tendency) or the amount of such weight to be determined by the jury. (*Moody* v. *Peirano,* 4 Cal. App. 411, [88 Pac. 380].)

"The presence in evidence of the pistol found in the defendant's room came in as a mere incident to the testimony, which showed the result of the search of defendant's room, and, conceding that it was improperly admitted in evidence, we cannot conceive how it could have prejudiced the defendant."

The evidence at the trial was to the effect that the cartridges found in the room occupied by Billings were contained in a tin can. The bullets were of the caliber known as "22 short" and "22 long," similar to those found near the place of the murder. The can was almost half filled with these cartridges and the two kinds were mixed together. There was a piece of paper around the top of the can. The jurors were, of course, entitled to consider the quantity and the manner of assembling these cartridges as indicating whether they might have been acquired for use in the manufacture of a bomb or for the small rifle which was also found in Billings' room.

There was testimony sufficient, if credited by the jury, to establish a conspiracy between Billings and Mooney to commit the crime.

From the record before us it appears that the defendant was confronted by testimony from many sources which fully supports the verdict found by the jury. He was defended with great ability in the superior court and he was similarly represented in this court. We cannot find that he was deprived of any right, statutory or constitutional, or that any material error of law was committed calling for a reversal of the judgment or an abrogation of the order denying his motion for a new trial.

The judgment and order are affirmed.