[Civ. No. 1109. Fourth Appellate District.—October 9, 1934.]

ETHOL M. McLENNAN, Respondent, v. HALL G. HOLDER, Appellant.

Wright, Monroe, Thomas & Glenn for Appellant.

A. R. Honnold for Respondent.

MARKS, J.—This is an appeal from a judgment in the sum of $7,500 rendered by the court sitting without a jury against defendant for negligently losing and leaving a gauze sponge in the pelvic cavity of plaintiff upon whom he performed an operation in a hospital in La Jolla, in the city of San Diego, on March 22, 1932, for the removal of a badly infected tumor.

Plaintiff was a young married woman of large stature. So far as she knew she had been in good health until about six weeks before the operation. Besides herself her household consisted of her husband and two stepchildren. She cared for the members of the family, did all of the housework, including the family washing, took care of some chickens and assisted her husband in the care of some stock. About two weeks before the operation she consulted Dr. Larzalere, a physician of Escondido, who discovered she was suffering from some growth in her pelvic cavity. She was put to bed, given treatments to which she did not respond and the doctor decided that an operation was necessary. Acting for Mrs. McLennan and her husband, he engaged the defendant to perform the operation and give the post-operative care and made arrangements with a hospital to receive her.

The defendant was a well-qualified, successful and very busy physician who specialized in abdominal operations. His skill and qualifications are admitted and it is not questioned that the operation was skilfully performed, other than the losing of the sponge and allowing it to remain in the pelvic cavity of his patient. The hospital at which the operation was performed was one of the best equipped and efficient in California. The sole question of negligence presented on this appeal is the losing of the sponge and leaving it within the operative field.

Plaintiff was taken to the hospital the day before the operation and prepared for it. The operation started at about 11:35 o'clock in the forenoon and the patient was removed from the operating room at about 1:15 o'clock in the afternoon.

The operation and the unfortunate occurrence which gave rise to this suit may be thus briefly described:

There were present in the operating room besides plaintiff, Dr. Larzalere, who assisted in the operation, the anesthetist, experienced, skilful and successful in his profession, the defendant, and two or more trained nurses. Plaintiff was placed on the operating table, which was inclined so that her legs and lower body were elevated above her head. This was done so that the bowels would recede into the upper abdominal cavity and leave the pelvic cavity, which was the operative field, as free and clear as possible. A medial line incision was made extending from the umbilicus to the pubes, which exposed the pelvic cavity and a large tumor which involved both Fallopian tubes and was adherent to the bowels and other organs. The tumor was filled with pus. The bowels were walled off from the pelvic cavity with from three to five large gauze retractor pads. The lower edges of the pads were placed on the floor of the cavity and were drawn upward across the face of the bowels. These pads had attached to them pieces of tape about fourteen inches long, which were drawn up and left outside of the body and surgical instruments attached to them. The operation was performed by a method known as "blunt dissection" in which the surgeon separated the tumor from the other portions of the body to which it had adhered by the use of his gloved hands. This caused capillary oozing of a considerable quantity of blood. This was stopped by the use of gauze pads similar to the retractor pads, although some of them might have been smaller in size. Each of these pads had sewed onto it a piece of tape fourteen inches long. For want of a better name we will call these pads sponges. When the bleeding became excessive at the spot where the surgeon was working he would stop it by wadding up sponges and placing them against the bleeding tissue. The tape was wadded up with the rest of the sponge and did not protrude to the outside of the patient's body. The surgeon would then work on another side of the tumor and when the bleeding became excessive the tissues were packed with the sponges. When the surgeon returned to work at a place which had been packed with sponges he would remove them. Sponges were also used to mop up pus that had escaped from the tumor. The used

sponges would go into the possession of one known as the "dirty nurse". At about the time the tumor was ready for removal, or was removed from the body, the anesthetist warned the defendant that he had better complete the operation as soon as he could as the condition of the patient was not very good, she showing signs of shock. Defendant replied that he was through and proceeded to finish the operation. The position of the patient was changed from inclined to level, the retractor pads were removed, the operative field cleaned, and defendant proceeded to suture the incision. He had completed the suturing of the peritoneum when the nurse informed him that the count of sponges showed that one was missing. The surgeon immediately removed the sutures and for about five minutes made an intensive search for the sponge in the abdominal and pelvic cavities of the patient. The anesthetist informed him that the condition of the patient was bad and she was showing signs of severe shock and should be removed from the operating table as soon as possible. The surgeon ended his search for the missing sponge, packed the operative field with gauze and closed the incision, leaving a gauze and a rubber drain to take care of pus and other fluids in the operative field.

. The patient was removed from the operating room to her bed and treatment was given to revive her from the operative shock. Her condition for three days was very serious and showed the correctness of the opinion of the anesthetist that she was suffering from severe shock and as a consequence the search for the lost sponge could not be continued.

Between ten days and two weeks after the operation a fecal fistula developed and fecal matter drained through the incision until about August 1, 1932. Such a happening is not unusual in operative cases of this kind where the tumor and bowels adhere. The separation of these adhesions causes a traumatic injury to the walls of the bowels which so weakens them that a fecal fistula often follows.

Plaintiff remained in the hospital about five weeks when she returned to her home in Escondido, remaining there under the care of a nurse. Dr. Larzalere took over her care. Defendant did not visit her, but received several telephone reports of her progress from Dr. Larzalere. Just before June 8, 1932, the condition of plaintiff was so

serious that it was thought best to have her return to the hospital with the probabilities of an exploratory operation by defendant. However, on June 8th, she passed the missing sponge through her bowels. The pad as passed was about four and one-half inches long with its other dimensions between two and two and one-half inches in one direction and between one and one and one-half inches in the other. When spread it was found to be four and one-half inches wide and twenty-two inches long with a double tape seven inches long attached. The pad was made of double thicknesses of gauze. After the sponge passed from her body plaintiff slowly recovered. The fecal fistula closed about August 1, 1932, and the drainage of pus stopped about January 1, 1933.

The pads and sponges were all furnished by the hospital and each had tape attached to it. They were counted and brought into the operating room in a sterile condition and handed to defendant for use as he required them. After being used they went into the possession of the ''dirty nurse'', whose duty it was to count them and check her count against the number brought into the operating room, reporting the results to the surgeon. In this manner the loss of one of the sponges was first discovered. This seems to be the general practice prevailing in all well-regulated hospitals. The surgeon does not attempt to count the pads or sponges but relies upon the count given him by the nurses. The surgeon attempts to bear in mind the points in the operative field in which the sponges are placed. In the operation on plaintiff thirty or more pads or sponges were used, owing to excessive bleeding. This is greatly in excess of the number usually required in a similar operation.

Appellant presents the following grounds for reversal of the judgment: 1. Error of the trial judge in permitting an amendment of the complaint at the close of plaintiff's case; 2. Errors in ruling on objections to questions propounded to plaintiff's witnesses; 3. That the findings and judgment are not supported by and are contrary to the evidence; 4. That the damages awarded are excessive. We will consider these assignments of error in the order here stated.

██ The trial judge permitted plaintiff to amend her complaint, over the objection of defendant, by inserting the italicized words in the following paragraph.

"Plaintiff alleges that in the course of said operation, and after the opening of plaintiff's abdominal cavity by said defendant, the defendant negligently and carelessly *lost and left and* caused and permitted to be left in plaintiff's body material and dressing consisting of a large piece or roll of gauze, and did close the incision in the abdomen of plaintiff with the said roll or piece of gauze still remaining in plaintiff's abdomen; that in performing said incision the bowels and intestines of this plaintiff were not cut or opened; that on or about June 8, 1932, this plaintiff passed from her rectum said piece or roll of gauze so negligently and carelessly permitted by defendant to remain in the body of plaintiff."

Defendant urges that permitting this amendment was prejudicial error as the statute of limitations had run at the time the amendment was made and that it set up a separate and independent act of negligence not originally plead which constituted a new cause of action. We cannot agree with this contention. The action was to recover damages for the negligent act of defendant in the course of the operation. These damages were caused by the sponge being left in plaintiff's body. Had it been lost, found and removed, no injury would have followed. It is our opinion that the italicized words constitute an explanation of how defendant "caused and permitted to be left in plaintiff's body material and dressing", and do not set up a separate or new cause of action.

During the course of the examination in chief of a physician and surgeon testifying for plaintiff, a long, hypothetical question was asked him which concluded as follows:

"Doctor, assuming the facts stated in Hypothetical question No. 1 as amended, would, in your opinion, the happening of the loss of the pad in the abdomen of the patient occurred if the surgeon performing the operation had exercised that degree of skill, care, knowledge and attention ordinarily possessed and exercised by surgeons in good standing, in San Diego and vicinity?"

Counsel for appellant made and the trial court overruled the following objection:

" . . . it calls for an opinion on the ultimate issue and invades the province of the court, that no sufficient founda-

tion has been laid, that it is immaterial, and a variance from the causes of action set forth in the pleadings.''

Counsel for defendant now urges that the question permitted the witness to usurp the function of the court and express an opinion on the ultimate issue to be decided by the court, namely, that a cause of action for negligence has or has not been established.

We have been cited to no California case in which the precise question has been decided. A somewhat similar question was presented by the defendant in the case of *Kershaw* v. *Tilbury*, 214 Cal. 679, at page 693 [8 Pac. (2d) 109]. While it was not there discussed at length by the court, a judgment in favor of the plaintiff was sustained. In *Patterson* v. *Marcus*, 203 Cal. 550 [265 Pac. 222], it is said:

''It has been held in this state that the implied contract on the part of the physician is that he possesses that reasonable degree of learning and skill possessed by others of his profession, and that he will exercise reasonable and ordinary care and skill in the application of that learning to accomplish the purpose for which he is employed. (*Houghton* v. *Dickson*, 29 Cal. App. 321 [155 Pac. 128].) As to what is or is not the proper practice is uniformly a question for experts and can be established only by their testimony.

In *Perkins* v. *Trueblood*, 180 Cal. 437 [181 Pac. 642], the court said:

''In *McGraw* v. *Kerr*, 23 Colo. App. 163 [128 Pac. 870, 873], it is said: 'Negligence on the part of a physician consists in his doing something which he should not have done, or in omitting to do something which he should have done.' Quoting further from the same case: 'The authorities are practically uniform in holding, . . . that as to what is or is not proper practice in examination and treatment, or the usual practice and treatment, is a question for experts, and can be established only by their testimony.' ''

In *National Automobile Ins. Co.* v. *Industrial Acc. Com.*, 132 Cal. App. 373 [22 Pac. (2d) 568], we find the following:

''The rule has been declared that what is or what is not proper practice or the usual practice in treatment are questions for experts and can be established only by their

testimony . . . (*Ingamells* v. *Goodfellow,* 109 Cal. App. 62 [292 Pac. 162]; *Roberts* v. *Parker,* 121 Cal. App. 264 [8 Pac. (2d) 908].)''

In *Priestley* v. *Stafford,* 30 Cal. App. 523 [158 Pac. 776], it is said:

''And since it must be conceded upon the evidence that the condition of the boy's hand and arm was due to undue pressure caused by the fact that the splints were adjusted in a manner which did not allow for the usual swelling accompanying such cases, the question as to whether such omission constituted negligence was one for expert testimony.''

The objection which we have quoted was made to but two hypothetical questions asked by counsel for plaintiff. He later in the trial asked numerous others which involved the expression of the same or a somewhat similar opinion on the part of the witness testifying without the objection now urged having been made in the court below. As to these later questions the transcript contains the following:

''Mr. Monroe: May it be understood that all questions asked of this witness, hypothetical questions calling for his opinion as to the degree of knowledge and skill possessed by surgeons in the vicinity of San Diego, are subject to the objection which I have already made as to his competency to answer the question?

''The Court: I would not ordinarily acquiesce, but I think I am willing to do that, that you may have reserved to you the general objection that the witness has not shown himself competent to express an opinion.

''Mr. Monroe: Yes.

''The Court: Yes, you may have that general objection reserved.''

An objection to the admission of evidence not made in the trial court cannot be urged on appeal for the first time. Even though we assume, but without holding, that the objections made to the two earlier hypothetical questions should have been sustained we cannot hold the error, if any, sufficiently prejudicial to require a reversal of the judgment because much the same evidence as that obtained in reply to the two earlier questions was admitted later in the trial, without the objection now urged being made.

■ In discussing the sufficiency of the evidence to sustain the judgment it is not out of place to state the rule prevailing in California governing the physician or surgeon in the practice of his profession as to the skill required to be used. In the absence of an express contract the physician or surgeon does not warrant cures. By taking a case he represents that he possesses the ordinary training and skill possessed by physicians and surgeons practicing in the same or similar communities and that he will employ such training, care and skill in the treatment of his patients. (*Patterson* v. *Marcus, supra; Hesler* v. *California Hospital Co.,* 178 Cal. 764 [174 Pac. 654]; *Houghton* v. *Dickson, supra; Priestley* v. *Stafford, supra; McCollum* v. *Barr,* 38 Cal. App. 411 [176 Pac. 463].)

"The rule concerning the degree of care required of the defendant as a specialist in his branch of dentistry is correctly set forth by counsel for respondent in their quotation from Ann. Cas. 1915D, page 1124, where it is said: 'One who holds himself out as a specialist in the treatment of a certain organ, injury or disease, is bound to bring to the aid of one so employing him, that degree of skill and knowledge which is ordinarily possessed by those who devote special study and attention to that particular organ, injury or disease, its diagnosis and its treatment, in the same general locality, having regard to the state of scientific knowledge at the time.' " (*Hopkins* v. *Heller,* 59 Cal. App. 447 [210 Pac. 975].)

The inference is clear that defendant was a specialist in abdominal operations.

■ A physician and surgeon of long experience, testifying for the plaintiff, said that good practice in San Diego and vicinity required the surgeon to obtain manual control of pads or sponges used to stay bleeding in the abdominal or pelvic cavities in operations such as here involved, or to bring the tape attached to the pad or sponge outside the patient's body and have there attached to it a metal ring or surgical instrument so that the pad could be traced through the means of the tape and would not be lost. It is admitted that the defendant did not use this method in his operation on plaintiff but, with the sponges used to stop bleeding, he wadded the gauze and tape together and placed the wad entirely within the patient's body. This evidence

in itself is sufficient to support the finding of negligence, as it is evidence that in this one respect defendant did not use the care and skill used by surgeons performing similar operations in the same or similar communities, according to the testimony to which we have just referred.

Defendant earnestly urges that the evidence of the expert testifying for plaintiff was given in connection with pads used for the purpose of retraction only and not as to sponges used to stop bleeding and that the evidence is clear that the tape attached to each retractor pad used by defendant was brought to the outside of plaintiff's body and surgical instruments there attached. It is true that a considerable portion of the testimony of this witness was directed to the use of retractor pads. He did make the statement to which we have referred as to the use of other pads or sponges, as is shown by the following quotation:

"By the Court: Q. Would that be particularly true where the tape is attached to the pad and placed in the abdominal cavity?

"A. Naturally, sir."

It is true that the number of experts testifying for the defendant exceeded those testifying for plaintiff. Defendant insists that the evidence as to the correctness of the methods employed by him in performing the operation so greatly preponderates in his favor as to completely overcome the evidence of the plaintiff on this question. A case cannot be decided in an appellate court on the numerical strength of witnesses. ▮ Conflicts in the evidence are settled in the trial court and a judgment cannot be reversed where there is competent and material evidence in the record supporting it.

▮ Plaintiff suggests that her evidence discloses that there were numerous things that could have been done, which were not done, to relieve the operative shock so that the search for the lost sponge could have been continued until it was found and removed. We are not particularly impressed with this argument. Defendant was confronted with a condition of great emergency during the search for the lost sponge. His patient was in a very serious condition, where her life was in danger and the element of time was most important. Under such circumstances he had to rely upon his own skill, knowledge and best judgment in

choosing the course to pursue. In *Hesler* v. *California Hospital Co., supra,* quoting from *Leighton* v. *Sargent,* 27 N. H. 474 [59 Am. Dec. 388], it is said:

" 'It is never enough to show that he has not treated his patient in that mode, nor used those measures, which in the opinion of others, even medical men, the case required; because such evidence tends to prove errors of judgment, for which the defendant is not responsible as much as the want of reasonable care and skill, for which he may be responsible.' "

The judgment is supported by the evidence because of the use of the method of placing the sponges completely within the pelvic cavity of plaintiff without the tapes being drawn outside her body so that each sponge could be traced and removed, rather than in the methods used to find the sponge after it was lost.

We are of the opinion that the findings and judgment are supported by the evidence. We have been assisted in reaching this conclusion by the following cases, all involving the loss of sponges during abdominal operations: *Samuels* v. *Willis,* 133 Ky. 459 [118 S. W. 339, 19 Ann. Cas. 188]; *Barnett's Admr.* v. *Brand,* 165 Ky. 616 [177 S. W. 461]; *Rayburn* v. *Day,* 126 Or. 135 [268 Pac. 1002, 59 A. L. R. 1062]; *Jackson* v. *Hansard,* 45 Wyo. 201 [17 Pac. (2d) 659]; *Spears* v. *McKinnon,* 168 Ark. 357 [270 S. W. 524]; *Moore* v. *Ivey,* (Tex. Civ. App.) 264 S. W. 283; *Akridge* v. *Noble,* 114 Ga. 949 [41 S. E. 78]; *Ault* v. *Hall,* 119 Ohio St. 422 [164 N. E. 518, 60 A. L. R. 128]; *Cassingham* v. *Berry,* 67 Okl. 134 [150 Pac. 139, 168 Pac. 1020]; *Brown* v. *Bennett,* 157 Mich. 654 [122 N. W. 305].

On the question of the amount of damages awarded, the trial court found that because of the loss of and the failure to remove the sponge "plaintiff suffered frequent high temperatures, nausea, vomiting, stoppage of the bowels, and terrific pains in the bowels and abdomen . . . and . . . suffered great bodily and mental pain, anguish, humiliation, nervous shock and permanent injury, . . . " These findings are all supported by the evidence. A physician and surgeon testifying for plaintiff was of the opinion that her period of recovery was prolonged three times by the presence of the sponge in her body. With this evidence and

the findings before us we cannot conclude that the $7,500 damages awarded are excessive.

Judgment affirmed.

Barnard, P. J., and Jennings, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on November 3, 1934, and an application by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on November 28, 1934.