[Civ. No. 1927. Fourth Appellate District.—November 16, 1936.]

JOHN JENSEN, Appellant, v. HARRY P. FINDLEY, etc., Respondent.

Edw. L. Johnson and Frank Birkhauser for Appellant.

Harry W. Horton for Respondent.

MARKS, J.—This is an action to recover damages suffered by plaintiff in the loss of his left eye which was treated by

defendant, a duly licensed physician who specialized in the treatment of diseases of the eye, ear, nose and throat in the city of El Centro in Imperial County. At the close of plaintiff's evidence the trial court granted defendant's motion for an instructed verdict and under such an instruction the jury brought in a verdict for the defendant. This appeal is from the judgment entered upon the verdict and from several unappealable orders.

In California there is a well-settled rule that before a trial judge may direct a jury to bring in a verdict for a defendant it must appear that there is no substantial evidence, nor inferences to be fairly drawn from the evidence, nor favorable presumptions fairly arising from the evidence, which would support a judgment for the plaintiff. With this rule in mind it becomes necessary to detail the evidence in order to determine if there is any such evidence, inference or presumption shown by the record.

Defendant was called by plaintiff as a witness for cross-examination under the provisions of section 2055 of the Code of Civil Procedure. Plaintiff is not bound by the evidence so given. This evidence of defendant may be thus summarized: He maintained offices in the city of El Centro and for twenty-five years had specialized in the treatment of diseases of the eye, ear, nose and throat, and so held himself out to the public. On or about May 22, 1933, plaintiff came to him for the treatment of a badly swollen and infected eye and defendant accepted him as a patient. Defendant immediately examined the eye and diagnosed the malady as gonorrheal ophthalmia. He irrigated the eye and otherwise cleaned it and painted the lids with a one per cent solution of silver nitrate. He informed plaintiff of the infected condition and warned him regarding it, advised the application of ice compresses continuously changed and also placed two drops of atropin solution in the eye. He told plaintiff to keep the eye clean with frequent irrigations of a salt or a boric acid solution. He also gave him a prescription for a one-half of one per cent solution of zinc sulphate with directions to place two or three drops in the eye every two hours. The use of this solution was changed after one day to a fifteen to twenty per cent solution of neo silval with like directions to those given with the first. Plaintiff returned to the doctor for treatment every day until June 1, 1933,

and received the same treatment with the addition of painting the eye with a four per cent solution of mercurochrome on May 31, 1933, as examination on that day showed the first appearance of a corneal ulcer. Defendant did not inform plaintiff of the exact nature of the infection but did warn him of the danger of infecting other organs. He did not cap or otherwise protect the other eye against infection. He did not take a smear from the pus and make a laboratory test of it as he regarded such procedure unnecessary as he was convinced of the exact nature of the infection from the time of his first examination. He did not order the hospitalization of plaintiff as plaintiff told him he had no money for hospitalization and as there was no free hospital available. On May 31, 1933, he gave plaintiff another prescription for a fifteen per cent solution of neo silval with directions to place two or three drops in the eye every two hours. Plaintiff paid defendant only for the first three treatments.

The testimony of plaintiff may be thus summarized: While he was in a moving picture theater on Saturday night, May 20, 1933, his left eye began to pain him. The pain continued on Sunday and he obtained some argyrol which he used as an eye lotion. On Monday the pain continued and as considerable pus was forming in the eye he went to defendant for treatment. Defendant told plaintiff that the eye was badly infected but gave him no warning. Defendant washed out the eye and put some medicine in it, the nature of which was unknown to plaintiff. Defendant gave plaintiff a prescription for medicine to be put in the eye every two or three hours, told him to keep it clean with irrigations of boric acid or salt water solutions every two or three hours, and to keep ice packs on it. These treatments were continued daily until the following Sunday (May 28, 1933) and no new directions were given. Defendant told plaintiff that hospitalization was unnecessary and that at first the infection extended only to the lids of the eye and not the eye ball. On Friday the eye commenced to bleed. This was called to defendant's attention on the following day and plaintiff was informed that he was doing all right. On Sunday the new prescription (for neo silval) was given and that medication used in the eye. (This prescription was not produced and is evidently the same prescription mentioned in the testimony of defendant as given on the second day of the treat-

ment, or May 23, 1933.) Plaintiff tipped over the bottle of medicine and obtained a duplicate prescription on Wednesday, May 31, 1933. He called at defendant's office once each day, twice on one day, from May 22, to June 1, inclusive, and received the treatment already described and faithfully carried out the directions for home treatment. On June 1, 1933, defendant told plaintiff ''I am afraid your eye won't do you any good any more''. On the next day plaintiff went to San Diego and consulted Dr. C. S. Marsden, who also was a specialist in the treatment of diseases of the eye. Dr. Marsden removed the eye ball the following day. Plaintiff testified that he had sufficient funds with which to pay for hospitalization had it been advised by defendant. He also testified that defendant did not recommend the capping of the right eye.

Dr. Marsden testified that he specialized in the treatment of the eye, ear, nose and throat and had treated numerous cases of gonorrheal ophthalmia, none of which had resulted in the patient losing the infected eye; that he had practiced in El Centro for about a year in 1924 and knew the accepted methods of treatment of that disease used by eye specialists in that locality. He testified that on June 2, 1933, when he first saw plaintiff the eye was full of pus, was badly swollen; that there was a perforation of the cornea and prolapsus of the iris. He took a smear from the eye, which smear was examined in a laboratory, the result showing that the infection was gonorrheal in nature. As sight from the eye was destroyed and could not be restored he removed the eyeball the next day. It required hospitalization for about one week and treatment for several weeks to cure the infection in the socket of the eye. Dr. Marsden testified that when an eye specialist saw a painfully swollen and infected eye exuding pus the first thought that would occur to him would be the presence of a gonorrheal infection and good practice in El Centro and elsewhere required that a smear should be taken and examined in order to determine the nature of the infection and the treatment to be used, for ''certainly gonorrheal ophthalmia is more severe and dangerous than a purulent conjunctiva non-specific. That is why in my opinion I recommend a smear to be done''.

In answer to a question on the necessity for hospitalization in cases of this kind, he testified as follows:

"I would like to answer that question in this way. I believe that every man would preferably like to have his patient in a hospital for the treatment of this disease no matter where he is. Sometimes we cannot always put our patients where we want them. I do not see how any individual can take care of their own eye with this disease."

Dr. Marsden testified that there is a well-recognized treatment among eye specialists for the disease. The main thing is to keep the pus out of the eye and away from the lids. Irrigation is used for this purpose and a solution of boric acid is valuable for this purpose. The frequency of the irrigations "are left to the discretion of the doctor and nurse according to the amount of pus that is being formed there, all the way from every fifteen minutes to every hour". There is also a well-recognized drug used as a specific in the treatment of the disease. It is a salt of silver, and among such silver salts are silver nitrate and neo silval, which should be applied to the eye after it is irrigated.

Dr. Marsden also testified that sulphate of zinc is not a specific for the disease. On the use of this drug the record shows his testimony as follows:

"Q. Doctor, I will call your attention to this zinc sulphate, or sulphate of zinc, whatever you call it. This zinc sulphate, doctor, has that any particular value in the treatment of gonorrheal ophthalmia? A. There is a great difference in the opinion about the use of drugs. Q. I understand that, but in your judgment has it any particular value in the treatment of gonorrheal ophthalmia or is it merely an astringent? . . . A. My judgment is that all of these things are the collections of things that have been done by doctors in the practice of medicine. My judgment in the matter is simply that I would not use it. Some other man might find it of value."

But one hypothetical question was propounded to Dr. Marsden. That question contained no reference to an important part of the treatment administered by defendant. The answer to the question was as follows:

"If I were treating such a case, I would want to have more energetic treatment. In this serious disease the outcome might be grave in any event."

On cross-examination Dr. Marsden testified that one of the objects to be attained in the treatment of the diseased

eye in question here is to reduce the inflammation and congestion as much as possible; that ''there is a difference of opinion in the use of ice'', but that ''the use of ice is a recognized treatment''; that ''an astringent is useful in the matter of reducing inflammation''; that zinc sulphate is an astringent and could be used for that purpose; that boric acid is a proper, suitable and standard prescription to be used to irrigate the eye and remove the pus; that a one per cent solution of silver nitrate is looked upon as ''par excellent'' for use as a specific but that there are other silver salts, among them, neo silval, which are recognized and used in its stead. His testimony on cross-examination is summed up in the following quotation:

''Q. When you start out with the treatment, it is proper to use an astringent and wash to reduce the inflammation and swelling? A. Yes, sir. Q. And use boric acid as a washing solution? A. Yes, sir. Q. When you start in to treat the germ itself, the use of neo silval would be proper? A. It is used by a good many. Q. It is a recognized, standard, proper treatment, is it not? A. Well, it is used. Q. You would not say its use was improper in any way, shape or form? A. No, sir. Q. You would not say that any person using that was not using the proper ingredient? A. It might be used. . . . Q. Now doctor, you made the statement on the stand with respect to the nature of the disease that existed with respect to this eye, if I understood it correctly, it was that regardless of the treatment that might be given to a person, it would be perfectly possible to lose the sight of the eye if he had the disease in question? A. Yes, sir.''

■ The degree of skill and care required of defendant as a specialist is clearly set forth in the case of *Hopkins* v. *Heller*, 59 Cal. App. 447, at page 452 [210 Pac. 975], as follows:

''The rule concerning the degree of care required of the defendant as a specialist in his branch of dentistry is correctly set forth by counsel for respondent in their quotation from Ann. Cas. 1915D, page 1124, where it is said: 'One who holds himself out as a specialist in the treatment of a certain organ, injury or disease, is bound to bring to the aid of one so employing him, that degree of skill and knowledge which is ordinarily possessed by those who devote special study and attention to that particular organ, injury

or disease, its diagnosis and its treatment, in the same general locality, having regard to the state of scientific knowledge at the time.' ''

We must measure the negligence, if any, of defendant by this rule. That he might have employed other medicines or used other methods of treatment is not sufficient to fasten the charge of negligence upon him. As was said in *McLennon* v. *Holder,* 1 Cal. App. (2d) 305, at 316 [36 Pac. (2d) 448]:

"In *Hesler* v. *California Hospital Co.,* 178 Cal. 764 [174 Pac. 654], quoting from *Leighton* v. *Sargent,* 27 N. H. 460, 474 [59 Am. Dec. 388], it is said: ' ''It is never enough to show that he has not treated his patient in that mode, nor used those measures, which in the opinion of others, even medical men, the case required; because such evidence tends to prove errors of judgment, for which the defendant is not responsible as much as the want of reasonable care and skill, for which he may be responsible.'' ' ''

The failure of defendant to use the skill and care required of him cannot be established by lay witnesses. In *Hiraide* v. *Cochran,* 109 Cal. App. 377 [293 Pac. 165], it was said:

"Respondents urge that in cases of this kind proof of negligence or lack of care or lack of skill on the part of a physician can only be made by the testimony of experts, viz., physicians familiar with the practice in the locality. Unless there is such testimony showing negligence no judgment can be sustained. (*Perkins* v. *Trueblood,* 180 Cal. 437 [181 Pac. 642]; *Houghton* v. *Dickson,* 29 Cal. App. 321 [155 Pac. 128]; *Linn* v. *Piersol,* 37 Cal. App. 171 [173 Pac. 763].) With such contentions the appellants do not take issue and of course could not because it is the recognized rule in this state.''

After a careful study of the several briefs filed by counsel for plaintiff we have concluded that they rely upon the following omissions to establish the negligence of defendant: (1) Failure to cap plaintiff's right eye. (2) Failure to take a smear from the left eye and have it tested. (3) Failure to hospitalize plaintiff. (4) Failure to use more energetic treatment on the eye. We will consider the several specifications in the order stated.

If we assume, without holding, that good practice required defendant to cap plaintiff's right eye, the failure to do so furnishes no ground for a reversal of the judgment. That eye was not infected and was not injured in any way. The failure to cap it was neither a proximate nor a contributing cause of any injury suffered by plaintiff.

Dr. Marsden was of the opinion that good practice required defendant to take a smear from the infected eye. It is admitted that one was not taken. According to this witness the purposes of the smear and its examination are (1) to determine the nature of the infection, and (2) the nature of the treatment, the nature of the treatment being dependent on the nature of the infection and its virulency. Defendant recognized the nature of the infection at his first examination and Dr. Marsden admitted that this could be done. Therefore, the only merit in this contention would depend upon the propriety and efficacy of the treatment administered by defendant which must be considered under the last ground urged for reversal.

There is no evidence to support the argument that hospitalization was a necessary part of the treatment of the disease required by the standards of good practice of an eye specialist in and around El Centro. The testimony of Dr. Marsden on this question, which we have quoted, does not support any such conclusion. The only conclusion to be drawn from his evidence is that hospitalization is desirable and that the doctor himself did not see how a patient could properly irrigate his own infected eye. This falls far short of establishing that the standard treatment in El Centro required hospitalization of patients suffering from gonorrheal ophthalmia.

When we analyze the evidence of Dr. Marsden on the question of the propriety of the treatment administered by defendant we find that his ultimate conclusion was contained in his statement that "If I were treating such a case, I would want to have more energetic treatment. In this serious disease the outcome might be grave in any event." He testified that "there is a great difference in the opinion about the use of drugs". He specially said that each step in the treatment administered by defendant was proper. This did not establish that defendant did not bring to the case, and did not use in his treatment of plaintiff "that

degree of skill and knowledge which is ordinarily possessed by those who devote special study and attention to that particular organ, injury or disease, its diagnosis and its treatment, in the same general locality, having regard to the state of scientific knowledge at the time''. (*Hopkins* v. *Heller, supra.*) It only tended to prove that in the opinion of Dr. Marsden a method or mode of treatment, or measures used, other than those employed by defendant, might have had a better result. This is not sufficient to make out a case for plaintiff. (*McLennon* v. *Holder, supra.*)

The hypothetical question propounded to Dr. Marsden did not set forth and include all of the treatment administered by defendant, and the objection made to it should have been sustained. It failed to take into consideration the testimony of plaintiff that during each of the twelve treatments given him by defendant some drug was placed in his eye. Plaintiff did not know the name of the drug used. Defendant testified that it was nitrate of silver. Of course, plaintiff was not bound by defendant's testimony, but without adopting it, he could not form an intelligent hypothetical question to put to his expert. The importance of the omission is shown by the statement of Dr. Marsden that he considered nitrate of silver a specific for the infection and par excellent in the treatment of the disease. With plaintiff admitting that defendant placed some drug in his eye during each treatment, and his expert believing that nitrate of silver was the best specific for the disease, the answer of the expert to the hypothetical question was of no value as the drug used was not named in the question asked and that part of the treatment administered by defendant was not referred to in it.

The judgment is affirmed. The appeals from the order granting the motion for an instructed verdict, from the order denying the motion for new trial, from all other orders and rulings made, and from the verdict rendered are dismissed.

Barnard, P. J., and Jennings, J., concurred.

A petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on January 14, 1937.