James Aubrey **BRUCE**, Plaintiff,

v.

**UNITED STATES of America,**
**Defendant.**

No. 1794.

United States District Court
S. D. California, N. D.

Oct. 29, 1958.

Miles, Sears & Franson, by Robert E. Sears, Fresno, Cal., for plaintiff.

Laughlin E. Waters, U. S. Atty., Richard A. Lavine, Asst. U. S. Atty., by James Stotter, II, Asst. U. S. Atty., Los Angeles, Cal., for defendant.

YANKWICH, Chief Judge.

By this action plaintiff James Aubrey Bruce seeks to recover damages under the Federal Tort Claims Act,[1] for alleged malpractice in his treatment and care at the Veterans Administration Hospital operated by the United States Government at Long Beach, California, to be referred to as the Long Beach Hospital. He entered the hospital as a patient on November 10, 1954, for treatment for tuberculosis, and he was confined for treatment in such hospital and at a Veterans Administration Hospital in Livermore, California.

## I

### The Issues Involved

The complaint states that on April 3, 1956, and while at the Long Beach Hospital, the plaintiff suffered (1) a

---

1. 28 U.S.C.A. § 1346(b).

fracture of his two hips, including a fracture of the left acetabulum and an intertrochanteric fracture of the right hip. Follow allegations that while the plaintiff does not know the cause of the fracture he is informed and believes that his injuries were caused proximately by the negligence of the defendant United States of America, acting by and through its employees at the hospital. The complaint particularizes three additional and sequential negligent acts in the treating and operating on the fracture as follows: (2) negligence in treating and operating upon the right intertrochanteric and the left acetabulum; (3) injury to plaintiff's left shoulder, alleged to have occurred during the operation; (4) injury to plaintiff's right knee, alleged to have been caused by a second operation performed on September 27, 1956. Asserting that, as a result of such negligent acts, the plaintiff has suffered injuries to his body and shock and injury to his nervous system and person, and great mental and physical pain and suffering, the complaint seeks damages in the sum of $200,000. An additional allegation of unspecified special damages need not concern us because the proof in the record is conclusive that, if additional medical or surgical care is needed, the same will be furnished, free of cost, to the plaintiff, as a veteran who is, at the present time, rated as totally disabled from a service-connected malady, tuberculosis, incurred while in the service in the armed forces of the United States in Korea. After admitting the plaintiff's hospitalization and treatment, the answer denied any negligence on the part of those in control of the hospital at Long Beach. The defenses of contributory negligence and sole negligence on the part of the plaintiff pleaded in the answer, need not detain us, for there is no proof in the record as to either of them. Allusion, however, should be made to the defense of assumption of risk which is stated in this manner:

"That the plaintiff was aware of the conditions surrounding the operations and hospitalization and was fully aware of any dangers inherent therein, the plaintiff voluntarily and without compulsion or coercion and with opportunity to do otherwise encountered the very conditions he now complains of and he thereby consented and assumed the risk of all injury therefrom."

## II

### The Problem to Be Resolved

In a pretrial order and by uncontradicted testimony the following facts stand undisputed. The plaintiff was admitted to the Veterans Administration Hospital at Long Beach, California, on November 10, 1954, for the treatment of tuberculosis, was ultimately released on July 12, 1957, from the Veterans Administration Hospital at Livermore, California, and is presently on leave from that institution.

In April of 1956, the plaintiff was suffering from an advanced case of pulmonary tuberculosis. He was ambulatory, but was highly restricted in the amount of moving about in the ward. On April 3, 1956, at approximately 11:45 o'clock p. m., he was in a private room which he occupied alone, in a ward of the Long Beach Hospital. At that time an episode occurred which has been described by some of the doctors who saw him within a few hours after the episode, as a convulsive or epileptic seizure.

For several days prior to this episode, the plaintiff had been noticeably nervous, irritable and upset. On April 3, 1956, he was given hypno-therapy for the purpose of alleviating complaints which he had of postoperative pain for past tubercular surgery which had been performed in July, 1955, at the Long Beach Hospital.

He was operated for the fracture of the hips on April 6, 1956. On September 27, 1956, the Jewett nail, which was inserted in the right hip at the time of the surgery, was removed by operative procedure. The plaintiff continued under the treatment of the Long Beach Hospital until November, 1956, at which time he was transferred to the Livermore

583

Veterans Administration Hospital, where he remained until July, 1957, at which time he was released to come home and was placed on leave status.

We must determine two questions: (1) Did negligence on the part of the hospital authorities cause the original fracture? and (2) Was there negligence in any of the operative procedures which followed?

### III

### The Governing Law

The passage of the Federal Tort Claims Act in 1946 attests, in the language of Mr. Justice Reed,

> "to the growing feeling of Congress that the United States should put aside its sovereign armor in cases where federal employees have tortiously caused personal injury or property damage."[2]

Because, by the very terms of the statute,[3] the government is made liable to the same extent as a private individual under similar circumstances, the law of the state in which the negligent act oc-curs determines liability.[4] So, the case at bar is governed by the law of California. A brief summary of the law of malpractice of California is, therefore, in order. California law requires that a physician and surgeon shall have the degree of learning and skill ordinarily possessed by physicians and surgeons of good standing practicing in the same locality, and use ordinary care and diligence in applying such learning and skill to the treatment of his patient.[5] Negligence on the part of a physician or surgeon is never presumed; it must be proved. This may be done either by expert testimony which shows that the standard of medical practice of the community *was not* followed or it may be inferred from proved facts and inferences which, by common knowledge, may be drawn from them.[6] If there be no showing of failure to apply the standard of reasonable care and skill to the particular case, the physician will not be held responsible for unexpected consequences merely because he may have committed an error of judgment.[7] This because he

2. American Stevedores, Inc., v. Porello, 1947, 330 U.S. 446, 453, 67 S.Ct. 847, 851, 91 L.Ed. 1011. See the writer's article, "Problems Under The Federal Tort Claims Act," 1949, 9 F.R.D. 143, 144–149.

3. 28 U.S.C.A. § 1346(b).

4. United States v. South Carolina State Highway Department, 4 Cir., 1948, 171 F.2d 893, 897; Stewart v. United States, 7 Cir., 1951, 186 F.2d 627, 630–631; Williams v. United States, 1955, 350 U.S. 857, 76 S.Ct. 100, 100 L.Ed. 761; Indian Towing Co. v. United States, 1955, 350 U.S. 61, 64–65, 76 S.Ct. 122, 100 L. Ed. 48; United States v. Union Trust Co., 1955, 350 U.S. 907, 76 S.Ct. 192, 100 L.Ed. 799; Fair v. United States, 5 Cir., 1956, 234 F.2d 288, 294–295; Rayonier, Inc., v. United States, 1957, 352 U.S. 315, 318–320, 77 S.Ct. 374, 1 L.Ed.2d 354.

5. Engelking v. Carlson, 1939, 13 Cal.2d 216, 220, 88 P.2d 695. We have chosen this statement because of its succinctness. The case from which it is taken was disapproved in Seneris v. Haas, 1955, 45 Cal.2d 811, at page 827, 291 P.2d 915, at page 924, 53 A.L.R.2d 124, insofar as it laid down rules for the ap-plication of the doctrine of *res ipsa loquitur* under particular circumstances. But the epitome in the text of the degree of skill required of physicians and surgeons in ordinary cases states California law correctly. Indeed, it is but a summary of the law as stated in a leading California case, Hesler v. California Hospital Co., 1918, 178 Cal. 764, 767, 174 P. 654, which has been followed consistently. See Bennett v. Los Angeles Tumor Institute, 1951, 102 Cal.App.2d 293, 295–296, 227 P.2d 473; Gluckstein v. Lipsett, 1949, 93 Cal.App.2d 391, 396, 209 P.2d 98; Sinz v. Owens, 1949, 33 Cal.2d 749, 753–754, 205 P.2d 3, 8 A.L.R.2d 757; 38 Cal.Jur.2d, Physicians and Surgeons § 69. In this respect, California follows what is the rule throughout the United States. See 41 Am.Jur., Physicians and Surgeons, § 82, p. 201; 70 C.J.S. Physicians and Surgeons § 41, pp. 947–948.

6. Lawless v. Calaway, 1944, 24 Cal.2d 81, 86–87, 147 P.2d 604; Huffman v. Lindquist, 1951, 37 Cal.2d 465, 473, 234 P.2d 34, 29 A.L.R.2d 485; Norden v. Hartman, 1955, 134 Cal.App.2d 333, 336–337, 285 P.2d 977; Friedman v. Dresel, 1956, 139 Cal.App.2d 333, 341, 293 P.2d 488.

7. Lawless v. Calaway, supra, 24 Cal.2d at page 86, 147 P.2d at page 606, note 6;

is not a "warrantor of cures"[8] nor is he "required to guarantee results." [9] The exception to these norms is contained in the cases which apply, in certain circumstances, the doctrine of *res ipsa loquitur*. Under it negligence may be inferred from the unusual character of the injury suffered when it occurs while a patient and his actions were under a doctor's or hospital's care and exclusive control. Three conditions must concur to make the doctrine applicable: (1) The injury must be of a character which would not occur but for an act of negligence; (2) It must be caused by an agency or instrumentality within the exclusive control of the physician; (3) It must not be due to any voluntary act on the part of the patient nor have been contributed to by him.[10] When these conditions for the application of the doctrine have been shown to exist, a *prima facie* case has been established. It then becomes the duty of a defendant charged with malpractice to prove (1) that the occurrence was due to a definite cause, unrelated to any negligence on his part, or (2) that the care given was such that the occurrence could not have been due to want of care, but must have been brought about by an unpreventable cause, although the exact cause is not known.[11]

In the last analysis, the doctrine of *res ipsa loquitur* is a mere method of proof. It is based upon the assumption that in certain instances the occurrence is so unusual that, absent a reasonable justification, those in control of the situation should be held responsible. Otherwise, in cases involving malpractice, a patient who came out of the hospital with a foreign object inside his abdomen, or with a broken limb or with paralysis that does not necessarily flow from the disease for which he was treated or the operation which he underwent, would be unable to trace the blame for his condition. So, the cases hold that whether a particular situation calls for the application of the doctrine is a question of fact. But if, after a prima facie case has been established by resort to the doctrine, the defendant has offered testimony in explanation of the occurrence, the trier of fact must determine if the inferences to be drawn by the application of the doctrine have been overcome, i. e., whether (1) the cause of the occurrence has been traced to a fact unrelated to negligence or, in case the occurrence cannot be traced to a specific cause, whether (2) the entire testimony is such as to exclude negligence on the part of the defendant as a proximate cause of the occurrence.

Huffman v. Lindquist, supra, 37 Cal.2d at page 474, 234 P.2d at page 40, note 6; Friedman v. Dresel, supra, 139 Cal. App.2d at pages 341–343, 293 P.2d at pages 493–494, note 6.

8. Hall v. Steele, 1924, 193 Cal. 602, 605, 226 P. 854, 855, and see Johnson v. Clarke, 1929, 98 Cal.App. 358, 361, 276 P. 1052.

9. Adams v. Boyce, 1940, 37 Cal.App.2d 541, 549, 99 P.2d 1044, 1049; and see Huffman v. Lindquist, Note 6, supra, 37 Cal.2d at page 475, 234 P.2d at page 40.

10. Ales v. Ryan, 1936, 8 Cal.2d 82, 94–99, 64 P.2d 409; Ybarra v. Spangard, 1944, 25 Cal.2d 486, 489, 491, 154 P.2d 687, 162 A.L.R. 1258; Cavero v. Franklin, General Benevolent Society, 1950, 36 Cal. 2d 301, 308–309, 223 P.2d 471; Dees v. Pace, 1953, 118 Cal.App.2d 284, 287–288, 257 P.2d 756; Seneris v. Haas, 1955, supra, 45 Cal.2d at pages 823–828, 291 P. 2d at pages 922–925, note 5; Oldis v. La

Société Française, 1955, 130 Cal.App.2d 461, 463–468, 279 P.2d 184; Bauer v. Otis, 1955, 133 Cal.App.2d 439, 443–446, 284 P.2d 133; Leonard v. Watsonville Community Hospital, 1956, 47 Cal.2d 509, 514–515, 305 P.2d 36; Salgo v. Leland Stanford, etc., Board of Trustees, 1957, 154 Cal.App.2d 560, 568–572, 317 P.2d 170.

11. Dierman v. Providence Hospital, 1947, 31 Cal.2d 290, 295, 188 P.2d 12; Farber v. Olkon, 1953, 40 Cal.2d 503, 510–511, 254 P.2d 520; Dees v. Pace, supra, 118 Cal.App.2d at page 289, 257 P.2d at page 758, note 10. It should be added that the mere fact that there has been an unfavorable result and that such incidence is small or rare, does not prevent the application of the doctrine just stated: Dees v. Pace, supra, 118 Cal.App.2d at page 289, 257 P.2d at page 758; Salgo v. Leland Stanford Jr. University Board of Trustees, 1957, 154 Cal.App.2d 560, 571–572, 317 P.2d 170.

### III

### The Proven Facts

The solution of the problem before us lies in the application of these principles to the facts proved at the trial. Before doing so, reference should be made to the fact that, as already appears, the plaintiff has had a long history of hospitalization, consequent upon pulmonary tuberculosis contracted during the Korean War. To this have been added other conditions for which he suffered when hospitalized, such as peripheral neuritis, due indisputably to chronic alcoholism. He has, as shown at the trial, "a low tolerance for pain." As of this day, he is considered totally disabled and receives compensation from the government according to the standards established in such cases. These facts do not bar his right to recover. For it is the law of California that aggravation of a physical condition is compensable to the extent to which it is caused by a subsequent negligent act. The principle was stated by the Supreme Court of California, over fifty years ago:

"The liability of one who commits an assault and battery or other unlawful violence to the person of another is not to be measured by the physical strength of the party injured, or his capacity to endure suffering. One of weak physical structure, or small vitality, or in ill health, has as much right to protection from violence as a robust athlete; and in either case the physical injury, the bodily harm, which is actually caused by the violence, whether he be strong or weak, healthy or sickly, is the natural consequence of the wrong, and need not be specially averred."[12]

So here, notwithstanding plaintiff's disability, he is entitled to recover for the added disability, pain and suffering *if they are traceable* to any of the negligent acts to which he attributes them. *In our view, they are not.*

In what follows we state our reasons for this conclusion as to each of the four instances in which malpractice has been alleged.

#### 1. *The fracture.*

Following a convulsive seizure on April 3, 1956, which was at the time described by attending physicians as of "epileptic type" and which, at the trial, has been definitely identified by experts in the field of psychiatry and neurology as *grand mal,* evidenced by outcry, frothing at the mouth and incontinence, followed by a period of unconsciousness, it was discovered that the plaintiff had suffered the fracture of the two hips already described. The two doctors who examined the plaintiff on the morning of the 4th did not discover the fracture. Later, the plaintiff was moved into a different ward and,—after consultation between the Orthopedic and Tubercular Divisions, which included consultation with the chief of the Orthopedic Section, Dr. Richard H. Hall, who is a certified orthopedic surgeon,—an operation was performed on April 6, 1956. The details of the operation will appear further on in the discussion. For the present, we are concerned with *the fact of fracture.* At the argument, counsel for the plaintiff stated "we have not proved how the hip fractures occurred," adding "we do not know how Mr. Bruce got these hip fractures." On February 11, 1957, in an application for compensation filed with the Veterans' Administration, he described his disability to have occurred on April 2nd and to have been caused by the convulsion. The statement is reproduced in the margin.[13] So far as the cause of the injury

12. Campbell v. Los Angeles Traction Co., 1902, 137 Cal. 565, 568, 70 P. 624, 626; Smith v. Schumacker, 1938, 30 Cal.App. 2d 251, 263, 85 P.2d 967; Matthews v. Atchison, T. & S. F. R. Co., 1942, 54 Cal.App.2d 549, 559–561, 129 P.2d 435;

United States v. Fotopulos, 9 Cir., 1950, 180 F.2d 631, 640.

13. "(1) *Hip fractures occurred night of April 2, 1956, to best of my knowledge and belief, while undergoing treatment for TB at Long Beach Veterans*

is concerned, it may be assumed that the plaintiff repeated what the medical authorities told him. But the plaintiff's explicitness as to the date of the injury has special meaning, in view of the fact that it is *now* contended that the fracture may have occurred during the period between the morning of April 4th and the morning of April 6th when the x-rays were taken. There is no credible evidence of a fall by the plaintiff either before April 3rd or during the period between April 4th and April 6th. He was occupying a room of his own with the door open, with a nurse in another room across a narrow corridor, who could notice any unusual incidents. The expert testimony is that while a fracture of this character could have been caused by a fall in the lavatory adjoining the room, or a fall from bed, it is doubtful that a person in plaintiff's physical condition and "low tolerance for pain" would have had the strength and determination to traverse the distance between the lavatory and the bed or to lift himself from the floor to the bed. Nor is there convincing testimony that between the morning of the 4th and the morning of the 6th the fracture could have been caused by the plaintiff's falling out of bed. So, the suggestion that guardrails placed on the bed might have prevented a fall loses all meaning. For it is inconceivable that a fall causing the fracture could have occurred without its being remembered by the plaintiff or being heard or observed by the hospital personnel and the doctors who were in attendance. During this period, the plaintiff, while in pain, was rational and responded to directions and inquiries by the hospital attendants. Neither the mild hypnosis to which he was subjected on April 2nd by a trained psychologist on the hospital's staff, nor the mild physical therapy applied to the plaintiff's legs between the 4th and the 6th could have caused the fracture or aggravated it. Nor can we indulge in the farfetched supposition that the hospital attendants in moving him from his bed onto the guerney on which he was wheeled for the taking of the x-rays and the operation dropped him or so inexpertly manipulated his legs as to cause the fracture. If a fall and the application of other external traumatic forces are eliminated as the cause of the fracture, as purely speculative, there remains the fact testified to by competent experts in the field that it was caused by the convulsive seizure. Their testimony and the literature to which they referred attest to the incidence of such result, rare though it may be. A period of 57 hours passed between the examination of April 4th and the taking of the x-rays on April 6th which disclosed with certainty the existence of the fracture. The evidence is conclusive that the delay was not harmful to the plaintiff. In sum, if the doctrine of *res ipsa loquitur* is applied to the occurrence of the fracture, the evidence in the case, considered as a whole, rebuts the presumption arising from its application, and logically justifies the inference that the fracture was caused by the seizure which, despite prior sporadic occurrences, could not have been anticipated by the hospital staff and was not induced by any other act of negligence on their part.[14]

---

*Hospital. It is my belief I· had a convulsion or nightmare and jerked so hard my pelvis was fractured.* I was examined that night by the Medical O. D. and again April 3, 1956 by Ward Physician. On April 6th I was x-rayed and it was then disclosed I had incurred bilateral hip fracture with extensive damage to my right hip, which necessitated immediate surgery. The leg and hip did not heal properly. Further surgery was contemplated in July but postponed. Finally on surgery was done—removal of swivel pin. Have very little use of my right leg and have been advised further surgery will be required to restore my hip to any degree of functioning. (2) Upon regaining consciousness from first hip surgery I was aware something had happened to my left shoulder. I had very little degree of motion and severe pains. X-rays were taken but no broken bones revealed. The injury occurred while in surgery or while under anesthetic and diagnosed as soft tissue."

14. See cases cited in Note 11.

**2.** *Alleged malpractice in the operation and subsequent care.*

The conclusion reached, which absolves the defendant of any blame for the fracture, makes it necessary to consider the alleged negligence in the operating procedures adopted and the subsequent care. The operation was performed by Dr. Edward F. Cunningham, Jr., who became a resident in general surgery at the Long Beach Hospital on July 1, 1955. He spent the first six months,—from July 1, 1955 to December 31, 1955,—in pathology and the next three months,—from January 1, 1956 through March 31, 1956,—in genito-urinary work. He was, in the language of the profession, rotating in the various services in order to complete a four-year residency necessary to qualify as a practitioner in general surgery. On April 1, 1956, he began rotation in orthopedic surgery. At the time of the operation he had acted as an assistant in orthopedic surgery in about fifty cases. Following the x-ray on April 6th, the plaintiff was sent to the Orthopedic Clinic for consultation. After the consultation, which was participated in by members of the orthopedic staff, including Dr. Hall, it was decided that the plaintiff had an intrusion type fracture of the left acetabulum and intertrochanteric fracture of the right femur, with comminution. The injury to the left hip need not concern us for counsel for the plaintiff, during the course of the examination of their expert Dr. Richard Neff, stated:

> "There is no claim of improper medical practice with respect to the left hip."

The operative procedure followed in regard to the right hip was substantially as follows: After the consent of the plaintiff was secured and clearance obtained from the Medical Director of the Tubercular Ward, the plaintiff signed an operative permit. This is significant, because in doing so, he assumed the hazard incident upon this type of operation. And the mere fact that an unfavorable result was obtained does not justify an inference of negligence.[15] In performing the operation an incision was made through the skin to reach the muscles. The muscles were then separated from their bony attachments at the upper portion of the femur, and around the trochanter and the neck of the femur in order to expose the upper third of the femur and the area of the fracture. The assistant stationed at the foot of the patient then exerted downward traction and a slight rotation of the leg. Three Kirschner wires were inserted to the fracture site, starting with the distal part of the fracture, through the fracture side into the neck and into the head of the femur, in order to determine whether there was a proper alignment of the fracture. After discussion, x-rays were taken with the wires in place. Then a Jewett nail was inserted to hold the fractures in place. In order to secure a satisfactory reduction the Jewett nail was inserted four times. On the fourth insertion Dr. Cunningham and those participating in the operation were satisfied that they had obtained a good reduction and placement of the fracture fragments. The wound was then closed, and, after a period of time, the patient was returned to the Ward. Later he was placed in a spica cast in order to further immobilize the fractures and was kept in it for some time. Buck's traction was also applied. While Dr. Cunningham, Jr., was the chief operating surgeon, the evidence in the record shows clearly that two others of long experience in orthopedic surgery, Dr. Adamson and Dr. Karbelnig at all times advised and directed the various steps, including the placing of the Jewett nail. As a fact, the evidence in the record shows that this operation was performed as much by "the team" at the patient's side as by Dr. Cunningham, Jr. X-ray pictures were taken and not until all the participating surgeons were satisfied that there was a satisfactory reduction and alignment was the operative

---

15. Dees v. Pace, supra, 118 Cal.App.2d at page 289, 257 P.2d at page 758, note 10; Salgo v. Leland Stanford Jr. University Board of Trustees, supra, 154 Cal.App. 2d at page 571, 317 P.2d at page 176, note 11.

procedure concluded. This is important in the case because it is argued that the failure to achieve a complete union which has resulted in a shortening of the plaintiff's right leg, accompanied by pain in its use, and which may require further operative procedures, may have been caused by the inexperience of Dr. Cunningham, Jr. As it is, the evidence in the record shows that this type of fracture presents difficulties even in the case of an ordinary person and that not only was the method followed by Dr. Cunningham, Jr., approved, counseled and directed by others more experienced in orthopedic surgery but also that it conformed, in all respects, to the standard of practice obtaining in the community as testified to not only by the doctors in the employ of the Long Beach Hospital but by other experts in the field who testified in the case. Indeed, the testimony of the plaintiff's own expert, Dr. Neff, warrants this conclusion. Quoting from the record:

"The Court: And referring to what occurred in the operating room, when they secured the fourth nail and they had a pretty fair alignment, as to that matter too *it is a question of opinion* whether they were justified in hoping that they had achieved the type of immobilizing the fractured bone that would ultimately result in union? Is that true?

"The Witness: *Yes.*"

Dr. Neff testified that, in his view, the nail should have been taken out before September 27th and that a further osteotomy or bone graft should have been performed either before or after that date. The government physicians actually in charge of the operative procedure and the postoperative care expressed the view that the delay in removing the nail was due to their conviction that no harm could result from its retention and that, on the contrary, the rentention for a longer period might aid in achieving what they ultimately hoped would be a complete union. They also expressed the view that while they contemplated further surgery, they believed that it could be delayed while the plaintiff made a greater effort, by using a cane instead of a crutch, to strengthen the right hip. In this manner he would improve his deformity, which would be finally remedied by additional surgery. The plaintiff and his wife were consulted about additional surgery. They rejected it. Dr. Neff's testimony confirmed this. Even at the trial the plaintiff expressed unwillingness to undergo further surgery. These and other facts in the record warrant the conclusion that, at all times, the doctors and surgeons who participated, either by consultation or in the operative procedures and determined what was to be done or left undone exercised their best judgment and that the procedure they followed conformed to the standard practice in such case in the community. This also is confirmed by the testimony of Dr. Neff:

"The Court: Doctor, you made an observation a while ago and I want to ask you to amplify one matter. *You said you would have extracted* the nail, but *you said other people would not.* I gather then that a surgeon confronted with a situation such as that, if a matter of this character were submitted to different surgeons, equally competent within the range of the competency required of surgeons in the community, *that there could be sincere and honest disagreements as to what or when any additional operative procedures or extraction of nails, or anything like that, should be resorted to; isn't that true?*

"The Witness: *That is true.*"

He conceded that in this type of fracture, even in the case of a person without the unfavorable medical history which the plaintiff had, the use of the Jewett nail, followed by a cast, is not always a "complete success." And while he expressed the opinion that the nail should have been taken out and traction applied after the first three to six weeks, he stated quite forthrightly that this *was a personal opinion with which others might disagree.* Quoting from the record:

"A. Well, the simplest thing to do would be to take out the nail and put it in traction, but it has to be done within a fairly reasonable period of time, or you—

"The Court: In other words, *it is your opinion that as a matter of ordinary practice, by ordinary standards, that regardless of other considerations such as those, in your opinion they should have taken it out?*

"The Witness: *No, that isn't my opinion. That is my opinion personally.*

"The Court: That is your opinion?

"The Witness: It is my opinion, *but it is not necessarily the opinion of other surgeons. I think you can very often disagree.*"

■ This very credible testimony by the plaintiff's own expert, even if it stood alone, would bar plaintiff's recovery for malpractice in the operation and in the postoperative care. For it is an accepted principle of law of California that the fact that a physician or surgeon *might have employed other methods* is not sufficient to charge him with negligence. At most, the failure to use such methods, *even though sanctioned by others in the profession,* amounts to an error of judgment from which no liability flows.[16] The principle has been summed up with great brevity by the Supreme Court of California.

" * * * the fact that another physician or surgeon might have elected to treat the case differently or use methods other than those employed by defendant does not of itself establish negligence." [17]

■ On the whole, we find no negligence in any of the operative or postoperative procedures followed in the case.

3. *Alleged injury to plaintiff's left shoulder.*

■ I am of the view that the evidence is insufficient to show that during the April 6 operation plaintiff suffered injury to his left shoulder. There is conclusive evidence that on many occasions in the past the plaintiff complained of pain in this shoulder. Whatever its nature, whether subjective or consequent upon the other maladies from which he has suffered, it *is not* traceable to any negligent act on the part of the hospital authorities while under their care.

4. *Alleged injury to the plaintiff's right knee.*

■ There is no evidence in the record warranting the conclusion that the plaintiff suffered an injury to his right knee at or after the operation of September 27, 1956. Significantly, in his claim for compensation, dated February 11, 1957, *and before the institution of this action,* no mention is made of such injury. The particular operation was simple. It amounted to the extraction of the Jewett nail, and was performed competently. There is nothing to warrant the inference that it resulted in any injury to plaintiff's right knee. And, as already appears, the failure to resort, at the same time, to other operative procedures, osteotomy or bone graft, has not had any unfavorable effect on plaintiff. Fortunately, such procedures, which according to Dr. Neff would involve an expenditure of $2,000 if done by a private physician, can still be carried on at Veterans Administration Hospitals without cost to the plaintiff in order that the slight deformity of the right leg may be corrected and the plaintiff be restored to a normal use of it.

Judgment will, therefore, be for the defendant, that the plaintiff take nothing by his complaint. Costs to the defendant. Findings and judgment to be prepared by counsel for the defendant under Local Rule 7, West's Ann.Code.

16. Hesler v. California Hospital Co., 1918, 178 Cal. 764, 766–767, 174 P. 654; McLennan v. Holder, 1934, 1 Cal.App.2d 305, 315–316, 36 P.2d 448; Jensen v. Findley, 1936, 17 Cal.App.2d 536, 543, 62 P.2d 430; Lawless v. Calaway, supra, 24 Cal.

2d at page 87, 147 P.2d at page 607, note 6; Costa v. Regents of University of California, 1953, 116 Cal.App.2d 445, 458, 254 P.2d 85.

17. Lawless v. Calaway, supra, 24 Cal.2d at page 87, 147 P.2d at page 607.